WILSON, J., FOR THE COURT:
 

 ¶ 1. Grace Ann McCarty was indicted for depraved-heart (second-degree) murder after she killed her husband, Joel, by backing his car over him in the driveway of their home. Grace claimed that Joel's death was an accident, but the jury found her guilty of manslaughter, and the court sentenced her to twenty years in the custody of the Mississippi Department of Corrections, with five years suspended and five years of post-release supervision. On appeal, Grace argues that there was insufficient evidence to sustain the conviction and that the jury's verdict was against the
 overwhelming weight of the evidence. She also argues that the trial judge should have granted her motion for a mistrial based on her allegation that Joel's cousin was "coaching" a witness during the trial. We find no error and affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Around 5 p.m. on November 2, 2014, Grace, Joel, Grace's ten-year-old daughter (Patricia), and Joel's adult son (Jay) were at the McCartys' home in Kosciusko. Jay testified that Grace and Joel were in front of the house and arguing about something. Jay could not recall the subject of the argument. Grace was "wanting to go somewhere" in Joel's car, a Chrysler PT Cruiser, but Joel told her "that she wasn't taking that car nowhere." Joel told her that "[h]e could call somebody to come get her or something," but he said, "That's the only vehicle I got right now and you're not taking it."
 

 ¶ 3. Jay testified that Grace got in the car despite what Joel had said. Patricia also got in the car. Joel responded by sitting down in the driveway several feet behind the car. Jay walked over to Joel and stood next to him. He urged Joel to get out of the driveway and go inside the house. Joel refused, stating that Grace was "not leaving in the car." Joel told Jay that it was "all right" and that he (Jay) should go back inside. Jay turned and started to walk back to the house. As he did, he heard the car back up and run over Joel.
 

 ¶ 4. Jay acknowledged that his memory was impaired as a result of head injuries that he suffered in a car accident when he was in college around 1995. He still sees a doctor about issues related to his injuries, and he takes medication for anxiety or agitation caused by the injuries. Jay testified that he takes a notebook with him everywhere and makes daily notes to help him remember things, but he did not write any notes about the day that Joel was killed. Jay testified that he could remember his father being run over because an event like that will "stick" in his mind. However, he could not remember where the family had been earlier that day, what Grace and Joel were arguing about, why they had gone outside the house, or other details about the day.
 
 [1]
 
 Jay also acknowledged that he discussed the incident with Joel's relatives before he spoke to police. He did not speak to the police until two or three months after the incident, and Joel's brother and uncle went with him when he did.
 

 ¶ 5. After the car backed over Joel, he was still breathing, but he was non-responsive and bleeding profusely. Grace called 911, and a recording of the call was admitted into evidence at trial. Grace told the 911 operator that she ran over Joel by accident. She said that "all [she and Patricia] were doing was going to the mailbox." An ambulance and police responded to the scene. Grace then told one of the officers that she and Patricia were going to a friend's house to retrieve Halloween decorations when she accidentally ran over Joel. Joel was taken to a local hospital and later died from his injuries.
 

 ¶ 6. Grace was arrested at a gas station later that evening for driving with a suspended license. Police were called to the gas station because of an argument between Grace and Joel's other son, Shay.
 

 ¶ 7. The following day, Grace gave a statement to Detective Mark Hill. Grace told Hill that she had been upset the night
 before and might have said some things that were not accurate. Grace said that Joel had been drinking heavily, that he and Jay were arguing, that both were very loud and upset, and that Joel had threatened to kill himself. Grace said that she and Patricia went to the car because they were afraid of Joel and Jay. She denied that she knew that Joel was sitting behind the car. Grace also told Hill that there were video cameras outside the house that might have recorded the incident, and she consented to a search of her residence for any video footage.
 

 ¶ 8. Hill went to the McCartys' home to check for any video footage recorded by the outside cameras. There were three cameras outside the house, but only two were plugged in and working. One camera was pointed toward the front porch, but it did not record any footage at or near the time that Joel was run over. A camera pointed down the driveway did capture video of the incident. However, for reasons that are not clear, the video starts just before the car backs over Joel.
 
 [2]
 

 ¶ 9. The video shows Joel sitting on the driveway with his legs crossed several feet behind the car. The car is already running. A male voice says something unintelligible, and then the car suddenly starts to back up. Joel tries to dive out of the way, but the car hits him. The right rear tire of the car drives over him. And then the right front tire drives over him before the car finally comes to a stop. Grace and Patricia exit the car. Patricia can then be heard screaming, and Jay can be heard yelling unintelligibly at Grace.
 

 ¶ 10. At trial, Grace testified that on the day in question, she, Joel, Patricia, and Jay all drove to Ethel to visit her father's grave because it was her father's birthday. She testified that she drove because "Joel had been drinking too much." She testified that Joel became "upset" at the cemetery because he remembered that "he had not gotten his mother and father a tombstone yet." On the drive back to Kosciusko, Joel and Jay "argued quite a bit." When they got home, Grace started making supper, but Joel was still upset about the tombstone and about financial difficulties. Joel and Jay continued to argue, and Grace could not calm them down. Joel became "irate" and "talked about killing himself," and Jay was also angry and cursing.
 

 ¶ 11. Grace testified that she and Patricia were afraid of Joel and Jay. She testified that after she put supper on the table, she and Patricia slipped out the door and ran to the car. According to Grace, Joel and Jay "did not know [she] was leaving," and she did not see or hear either of them follow her outside. She testified that she turned on the car and pushed the gas, and the next time she saw Joel was "when he was in front of [the] car after [she] had run over him." The next time she saw Jay was "a few seconds later." Grace claimed that she stopped the car as soon as she realized she had hit something, although both the rear and front tires drove over Joel. Grace testified that she never saw Jay outside of the house.
 
 [3]
 

 ¶ 12. Patricia's testimony at trial was generally consistent with Grace's testimony.
 

 Like Grace, Patricia testified that she did not see Joel outside the house until after the car had backed over him. Patricia testified that she saw Jay standing on the sidewalk next to the driveway just as the car started to back up.
 

 ¶ 13. Grace testified that she told the 911 operator that she was only going to the mailbox because her driver's license was suspended. Grace claimed that she was afraid that, if she told the truth, she would be arrested for driving with a suspended license and she would be not be able to go to the hospital with Joel.
 

 ¶ 14. Grace also claimed that when Detective Hill came to her house the next day, he found and the two of them watched a second video that was recorded by the surveillance cameras. She testified that the video showed her and Patricia running down the walkway to the car, and then Joel ran out behind them and "sat down behind [the] car" just before she backed over him. Grace claimed that, after watching the video, Hill assured her that the case should never go before a grand jury because it was "obvious" that it was an accident and that she could not have seen Joel. Grace's mother also testified that she heard Hill make these assurances. However, Hill denied that he had seen such a video or made any such statements. Grace testified that she did not "believe that [Hill] would lie" but "maybe he had forgotten" about this evidence.
 

 ¶ 15. During the trial, after the State and defense had both rested, Grace made a motion for a mistrial, alleging that Joel's cousin David had "coached" Jay during Jay's testimony in the State's case-in-chief. In a hearing outside the presence of the jury, Grace offered testimony from three people who had been in the audience during Jay's testimony. Two of the witnesses were close friends of Grace's attorney. The third was the publisher of the local newspaper. They testified that they observed David nodding his head in an "exaggerated" manner during Jay's testimony. One testified that Jay seemed to "pause" before answering questions, but none of the witnesses observed any eye contact between Jay and David. Nor could any of them say that Jay appeared to be taking cues from David.
 

 ¶ 16. David and Jay both denied that any "coaching" occurred. David testified that he was simply reacting to Jay's testimony, just as he did during other witnesses' testimony. The trial judge found that the allegation of coaching was "absurd," and he denied the motion. The judge stated that he "certainly" would have noticed "any type of coaching" because he was seated "less than six feet from [Jay]" with "a complete clear view of everyone ... in the audience of the courtroom."
 

 ¶ 17. After the presentation of the evidence, the court instructed the jury on depraved-heart murder, culpable-negligence manslaughter, and heat-of-passion manslaughter. Grace initially objected to an instruction on heat-of-passion manslaughter, arguing that there was insufficient evidence of provocation or "heat of passion." However, after the trial judge ruled that he would instruct the jury on culpable-negligence manslaughter, Grace's attorney specifically stated that she had "no objection" to an instruction on heat-of-passion manslaughter. The instruction on the form of the verdict did not require the jurors to specify a theory of manslaughter if they found Grace guilty of manslaughter. The jury returned a verdict finding Grace "guilty of manslaughter." The circuit court sentenced Grace to serve twenty years in the custody of the Mississippi Department of Corrections, with five years suspended and five years of post-release supervision. The court subsequently denied Grace's motion
 for judgment notwithstanding the verdict or a new trial, and Grace appealed.
 

 ANALYSIS
 

 ¶ 18. As noted above, Grace argues that the evidence was insufficient to support the conviction, that the jury's verdict was against the overwhelming weight of the evidence, and that the trial judge erred by denying her motion for a mistrial. In addition, the dissent argues that a mistake in the jury instruction on culpable-negligence manslaughter requires a new trial, although Grace did not raise the issue at trial or on appeal. We address these issues in turn.
 

 I. Weight and Sufficiency of the Evidence
 

 ¶ 19. As noted above, the trial judge instructed the jury on two theories of manslaughter: culpable-negligence manslaughter and heat-of-passion manslaughter. Grace challenges the sufficiency of the evidence and the jury's verdict on both theories. We address the two theories of manslaughter separately below, but we start with two overarching rules that govern our review.
 

 ¶ 20. First, our Supreme Court has held "in a number of cases and in a wide variety of contexts that, where there is in the record evidence legally sufficient to support a jury finding of guilty of murder, had the jury so found, the defendant will not be heard to complain that a manslaughter instruction was given."
 
 Jackson v. State
 
 ,
 
 551 So.2d 132
 
 , 146 (Miss. 1989). "This has been held so
 
 even though the manslaughter instruction was not warranted under the evidence
 
 ."
 

 Id.
 

 (emphasis added). When "a defendant is convicted of manslaughter upon an instruction granted by the [S]tate to that effect and the evidence would have justified a conviction of murder, the instruction on manslaughter,
 
 even if not authorized by the evidence
 
 , does not constitute reversible error."
 
 Grace v. State
 
 ,
 
 379 So.2d 540
 
 , 542 (Miss. 1980) (emphasis added). Therefore, in the present case, if the State presented sufficient evidence of the greater offense of depraved-heart murder, Grace cannot complain that the jury instead convicted her of the lesser offense of manslaughter-even if there is insufficient evidence of "heat of passion" or some other element of manslaughter.
 

 Id.
 

 ;
 
 Cole v. State
 
 ,
 
 405 So.2d 910
 
 , 913 (Miss. 1981).
 
 [4]
 

 ¶ 21. Second, "reversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction."
 
 Batiste v. State
 
 ,
 
 121 So.3d 808
 
 , 840 (¶ 57) (Miss. 2013) (citing
 
 Griffin v. United States
 
 ,
 
 502 U.S. 46
 
 , 59,
 
 112 S.Ct. 466
 
 ,
 
 116 L.Ed.2d 371
 
 (1991) ). "This is because 'jurors are well equipped to analyze the evidence."
 

 Id.
 

 (quoting
 
 Griffin
 
 ,
 
 502 U.S. at 59
 
 ,
 
 112 S.Ct. 466
 
 ). We presume that the "jury was perfectly capable of sifting through the evidence and was able to discard any factually insufficient theories."
 

 Id.
 

 at (¶ 58) (quoting
 
 Fulgham v. State
 
 ,
 
 46 So.3d 315
 
 , 325 (¶ 28) (Miss. 2010) ). Therefore, in the present case, the manslaughter conviction must be affirmed if the State presented sufficient evidence of
 
 either
 
 heat-of-passion manslaughter
 
 or
 
 culpable-negligence manslaughter-even if we find that "one of those theories is factually inadequate to sustain the conviction."
 

 Id.
 

 at (¶ 57).
 
 [5]
 

 ¶ 22. Thus, based on these two rules, we must affirm the manslaughter conviction in this case if the evidence was sufficient to sustain a conviction for
 
 either
 
 the indicted offense of depraved-heart murder
 
 or either
 
 theory of manslaughter that was submitted to the jury.
 

 A. Standards of Review
 

 ¶ 23. When we address a challenge to the sufficiency of the evidence, the question is not whether
 
 this Court
 
 "believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
 
 Bush v. State
 
 ,
 
 895 So.2d 836
 
 , 843 (¶ 16) (Miss. 2005),
 
 abrogated on other grounds by
 

 Little v. State
 
 , No. 2014-CT-01505-SCT,
 
 233 So.3d 288
 
 , 289-90, 291-93,
 
 2017 WL 4546740
 
 , at *1, *3-*4 (¶¶ 1, 14-21) (Miss. Oct. 12, 2017) ) (quoting
 
 Jackson v. Virginia
 
 ,
 
 443 U.S. 307
 
 , 315,
 
 99 S.Ct. 2781
 
 ,
 
 61 L.Ed.2d 560
 
 (1979) ).
 

 ¶ 24. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."
 
 Id.
 
 at 844 (¶ 18). The evidence must be "[v]iewed in the light most favorable to the verdict," and we must affirm unless "[t]he trial court ... abuse[d] its discretion in denying a new trial."
 
 Id.
 
 at (¶ 19).
 

 ¶ 25. The role and function of an appellate court is materially different from the "role and function of the jury."
 
 Groseclose v. State
 
 ,
 
 440 So.2d 297
 
 , 300 (Miss. 1983). Our Supreme Court recently made clear that when a defendant challenges the sufficiency of the evidence or argues that the verdict is against the weight of the evidence,
 

 neither this Court nor the Court of Appeals assumes the role of juror on appeal. We do not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury.
 

 Little
 
 ,
 
 233 So.3d at 289
 
 ,
 
 2017 WL 4546740
 
 , at *1 (¶ 1) ;
 
 see also
 

 id.
 
 at *4 (¶ 20).
 

 B. Depraved-Heart Murder
 

 ¶ 26. As discussed above, Grace was indicted for depraved-heart (second-degree) murder, and the trial court instructed the jury on that charge. The jury found Grace guilty of the lesser offense of manslaughter; however, our Supreme Court has held that if the evidence is legally sufficient to find the defendant guilty of murder, the defendant cannot complain that she was instead convicted of manslaughter.
 
 See supra
 
 (¶ 20) & n.4. Accordingly, we discuss the sufficiency of the evidence as to the charge of murder.
 

 ¶ 27. Second-degree murder is "[t]he killing of a human being without authority of law" by "an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual."
 
 Miss. Code Ann. § 97-3-19
 
 (1)(b) (Rev. 2014). "Depraved-heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness ...."
 
 Hawkins v. State
 
 ,
 
 101 So.3d 638
 
 , 643 (¶ 17) (Miss. 2012). The Supreme Court has described conduct "evincing a depraved heart" as "grave recklessness manifesting utter disregard or indifference to [a] resultant creation of eminent danger to [human] life."
 
 Windham v. State
 
 ,
 
 602 So.2d 798
 
 , 802 (Miss. 1992). "Depraved-heart murder encompasses 'a reckless and eminently dangerous act directed toward a single individual,' from which malice is implied."
 
 Holliman v. State
 
 ,
 
 178 So.3d 689
 
 , 698-99 (¶ 20) (Miss. 2015).
 

 ¶ 28. In this case, the State presented sufficient evidence of the essential elements of second-degree murder. Jay's testimony was sufficient to support the State's theory that Grace knew that Joel was sitting behind her car when she ran over him. This testimony was, at minimum, sufficient for a rational juror to find that Grace acted with "grave recklessness manifesting utter disregard or indifference to [a] resultant creation of eminent danger to [Joel's] life."
 
 Windham
 
 ,
 
 602 So.2d at 802
 
 . Under Supreme Court precedent, the sufficiency of the evidence as to murder disposes of any challenge to the sufficiency of the evidence of manslaughter.
 
 See supra
 
 (¶ 20) & n.4.
 

 C. Culpable-Negligence Manslaughter
 

 ¶ 29. Under Mississippi law, "culpable negligence" is "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life."
 
 Hawkins
 
 ,
 
 101 So.3d at 643
 
 (¶ 17). Culpable-negligence manslaughter simply involves a lesser degree of "culpability" and "recklessness" than depraved-heart murder.
 

 Id.
 

 As there was legally sufficient evidence of depraved-heart murder, there was also legally sufficient
 evidence of culpable-negligence manslaughter.
 

 ¶ 30. While not disputing that there was legally sufficient evidence of culpable negligence, the dissent argues that the verdict was against the overwhelming weight of the evidence. We disagree. Jay testified that Joel and Grace argued in the driveway as she was getting into the car, that Joel specifically told Grace that he would not allow her to leave in his car, and that Joel then sat down in the driveway behind the car. Jay testified that he then walked over to Joel and stood next to him, talked to him, and urged him to move out of the way. When Joel refused, Jay walked away, and Grace ran over Joel. If the jurors found Jay's testimony credible on these material points, they were justified in concluding that Grace knew that Joel was behind the car and intentionally backed over him. At the very least, the jury could have found that Grace drove the car toward Joel with "wanton disregard, or utter indifference to," his life.
 
 Hawkins
 
 ,
 
 101 So.3d at 643
 
 (¶ 17).
 

 ¶ 31. The dissent's contrary analysis essentially adopts Grace's arguments that Jay's testimony was not credible because of his impaired memory and the possible influence of Joel's family. Contrary to the Supreme Court's recent decision in
 
 Little
 
 ,
 
 supra
 
 , the dissent expressly asserts the prerogative to make its own judgments of "witness credibility."
 
 Post
 
 at (¶ 81).
 
 [6]
 
 However,
 
 Little
 
 expressly reaffirmed that appellate courts "do not assess the witnesses' credibility" and cannot "make witness-credibility determinations."
 
 Little
 
 ,
 
 233 So.3d at 289-90, 292-93
 
 ,
 
 2017 WL 4546740
 
 , at *1, *4 (¶¶ 1, 20). Rather, "the jury [is] the sole judge of the credibility of the evidence and the weight and worth of their testimony."
 

 Id.
 

 , at 292,
 
 2017 WL 4546740
 
 at *4 (¶ 20) (quoting
 
 Gathright v. State
 
 ,
 
 380 So.2d 1276
 
 , 1278 (Miss. 1980) ).
 

 ¶ 32. "Despite the impeachment of [Jay], the jury remained the ultimate decision-maker as to what weight and worth to give his testimony."
 
 Jordan v. State
 
 ,
 
 763 So.2d 935
 
 , 937 (¶ 4) (Miss. Ct. App. 2000) ;
 
 accord
 

 Ivy v. State
 
 ,
 
 764 So.2d 476
 
 , 478 (¶ 4) (Miss. Ct. App. 2000) ;
 
 Brown v. State
 
 ,
 
 764 So.2d 463
 
 , 467 (¶ 11) (Miss. Ct. App. 2000). It is the jury's responsibility to judge the credibility of the witnesses.
 
 Little
 
 ,
 
 233 So.3d at 289-90, 292-93
 
 ,
 
 2017 WL 4546740
 
 , at *1, *4 (¶¶ 1, 20). "[I]t is not this Court's function to determine whose testimony to believe and as such we should not disturb a jury's finding on conflicting testimony where there is substantial evidence to support the jury's verdict."
 
 Bridges v. State
 
 ,
 
 716 So.2d 614
 
 , 617 (¶ 15) (Miss. 1998). "The testimony of a single uncorroborated witness is sufficient to sustain a conviction, even though there may be more than one person testifying to the contrary."
 
 Williams v. State
 
 ,
 
 512 So.2d 666
 
 , 670 (Miss. 1987) (citations omitted) (affirming the denial of the defendant's motion for a new trial). "Unless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decision in such matters is beyond the authority of a reviewing court to disturb."
 
 Brown
 
 , 764 So.2d at 467 (¶ 9).
 

 ¶ 33. While Grace raised legitimate questions about Jay's memory and motives, these were ordinary issues of impeachment and credibility for a jury to resolve. There was no physical evidence or objective evidence that impeached the material points of Jay's testimony. Nor does the overwhelming
 weight of the evidence show Jay's version of events to be "implausible." The jury was entitled to find Jay more credible than Grace and the other defense witnesses and return a guilty verdict.
 

 ¶ 34. In contrast to its treatment of Jay's testimony, the dissent is understanding of Grace's own shifting stories. The dissent notes that the day after Grace ran over Joel, "she volunteered" that her "prior stated reasons" for leaving the house "were not accurate."
 
 Post
 
 at (¶ 84). That is one way to put it, but the jury was entitled to conclude that Grace came up with a third lie only after realizing that neither of her first two stories-going to the mailbox and to retrieve Halloween decorations-provided a plausible or satisfactory explanation for how Joel ended up beneath the wheels of his car.
 

 ¶ 35. The dissent also says that the video in evidence "does not impeach Grace or Patricia's testimony, nor does it corroborate Jay's."
 
 Post
 
 at (¶ 86). This is an odd way to put it because the converse is (at least) as true-i.e., the video does not impeach Jay's testimony, nor does it corroborate Grace's. The video starts just before Grace backs over Joel. Joel is already seated behind the car when the video begins, and he tries to dive out of the way when he realizes that the car is moving toward him. The video does not show or suggest that he came "running out and sat down behind [the] car," as Grace claimed.
 
 [7]
 

 ¶ 36. Finally, the dissent seems to credit Grace's (and her mother's) claim about a missing video that would have exonerated her.
 
 Post
 
 at (¶¶ 89-90). Grace suggested that Detective Hill "maybe ... had forgotten" about this critical evidence. But Hill denied that he had ever seen such a video, and an expert in computer forensics testified that he found no evidence that any other video footage was saved or deleted on the day in question. The jury certainly was entitled to find Hill more credible on this point than Grace and her mother.
 
 [8]
 

 ¶ 37. In summary, the jury's verdict was not against the overwhelming weight of the evidence. The State and the defense presented conflicting testimony. It was up to the jury to sort out the conflicts and decide who was credible and who was not. The jurors were entitled to believe some witnesses and disbelieve others. That is the basic "role and function of the jury" in a criminal case.
 
 Groseclose
 
 ,
 
 440 So.2d at 300-01
 
 . It is not the role of this Court on appeal.
 
 Little
 
 ,
 
 233 So.3d at 289-90, 292-93
 
 ,
 
 2017 WL 4546740
 
 , at *1, *4 (¶¶ 1, 20).
 

 D. Heat-of-Passion Manslaughter
 

 ¶ 38. Grace also argues that her manslaughter conviction must be reversed because
 there was insufficient evidence that she acted "in the heat of passion."
 
 See
 

 Miss. Code Ann. § 97-3-35
 
 (Rev. 2014);
 
 Agnew v. State
 
 ,
 
 783 So.2d 699
 
 , 703 (¶ 14) (Miss. 2001) (defining heat of passion).
 

 ¶ 39. As discussed above, it is unnecessary to address this issue because there was sufficient evidence of both depraved-heart murder,
 
 see, e.g.
 
 ,
 
 Cole
 
 ,
 
 405 So.2d at
 
 913 ;
 
 Grace
 
 ,
 
 379 So.2d at 542
 
 , and culpable-negligence manslaughter.
 
 Batiste
 
 ,
 
 121 So.3d at 840
 
 (¶ 57) ("[R]eversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction.").
 

 ¶ 40. In any event, under our Supreme Court's precedent, there is legally sufficient evidence of heat of passion. Jay testified that Grace and Joel were in a heated argument outside the house, and Joel told Grace "that he wasn't going to let her take the car in ... the shape she was in." And Jay testified that he "heard ... somebody raise[ ] their voice toward [Joel]."
 
 [9]
 
 Joel then sat down in the driveway behind the car to prevent Grace from leaving in the car, and Grace ran over him.
 

 ¶ 41. The dissent notes that there was no proof of physical contact between Joel and Grace and that Jay could not remember the subject of their argument,
 
 post
 
 at (¶ 93), but neither point requires us to reverse the conviction. Provocation may take the form of "words or acts,"
 
 e.g.
 
 ,
 
 Agnew v. State
 
 ,
 
 783 So.2d 699
 
 , 703 (¶ 14) (Miss. 2001), and our Supreme Court has affirmed heat-of-passion manslaughter convictions on less evidence of provocation and passion than there was in this case.
 

 ¶ 42. For instance, in
 
 Jackson
 
 , the defendant/husband claimed that an armed intruder had killed his wife, but after investigating officers unearthed no evidence of an intruder, the husband was indicted for murder and ultimately convicted of heat-of-passion manslaughter.
 
 See
 

 Jackson
 
 ,
 
 551 So.2d at 135-36
 
 . On appeal, he argued that there was no evidence of heat of passion, but the Supreme Court rejected this argument, reasoning as follows:
 

 The evidence in the present record reflects that Jackson and his wife were a happily married couple with no outward evidence of marital discord. Jackson had been a law abiding citizen, a pillar of the community. The physical facts were that Mary Nell Jackson was bludgeoned to death by repeated blows to her head with a blunt instrument, that a broken Coca Cola bottle was found at the scene, and that her wounds were consistent with the theory that the coke bottle delivered these blows. The evidence recounted above could also lead a reasonable hypothetical juror to believe that no one was present ... other than Jackson and his wife. From these facts, it may fairly be said that the jury's reasonable conclusion was that some sudden and unexpected provocation-admittedly unexplained-enraged Jackson causing him to take leave of his senses for a few moments to grab a nearby object-a coke bottle-and in the heat of passion strike his wife repeatedly. That we are without evidence of exactly what may have provoked Jackson may not on these facts serve to exclude this hypothesis as one that a reasonable juror may have found beyond a reasonable doubt to have occurred.
 

 Id.
 

 at 146-47
 
 (emphasis added). That is, the jury could infer that "some" "admittedly unexplained" "provocation" had so "enraged"
 

 the defendant that he killed his wife-even though there no "evidence of exactly what may have provoked him."
 

 ¶ 43. Similarly, in
 
 Grace
 
 , the defendant claimed that he shot his girlfriend by accident, but he was indicted for murder, and the jury ultimately found him guilty of heat-of-passion manslaughter.
 
 Grace
 
 ,
 
 379 So.2d at 541-42
 
 . On appeal, the defendant claimed that there was insufficient evidence of heat of passion, but the Supreme Court found sufficient evidence in a witness's testimony that he "heard a scream followed a second or two later by a shot."
 

 Id.
 

 at 542
 
 . The Court reasoned that "[i]f the jury believed [this] testimony ..., they could have reasonably inferred from this screaming that the parties were engaged in some type of dispute."
 

 Id.
 

 at 542
 
 . Again, the jury could simply infer that "some type of dispute" had so enraged the defendant that he killed his girlfriend.
 

 ¶ 44. If there was sufficient evidence of "heat of passion" in
 
 Grace
 
 and
 
 Jackson
 
 , there was in this case too. Jay testified that Joel and Grace were arguing and that the argument escalated to the point where Grace wanted to leave but Joel sat down behind the car to prevent her from doing so. Under our Supreme Court's precedent, this was sufficient for the jury to conclude that Joel's words and actions provoked Grace to a "heat of passion."
 

 II. Motion for a Mistrial
 

 ¶ 45. We review the denial of a motion for a mistrial for abuse of discretion.
 
 Ford v. State
 
 ,
 
 206 So.3d 486
 
 , 491 (¶ 14) (Miss. 2016). Grace presented no evidence that Jay's testimony was "coached." As discussed above (
 
 supra
 
 ¶ 15), Grace's motion was based on testimony that a relative in the audience nodded his head in an "exaggerated" manner. There was no legal or evidentiary basis for a mistrial, and the trial judge did not abuse his discretion by denying the motion.
 

 III. Plain Error
 

 ¶ 46. The dissent also argues that a new trial is required because of a mistake in the jury instruction regarding culpable-negligence manslaughter, which stated as follows:
 

 The Court instructs the jury that culpable negligence manslaughter is the killing of a human being, by culpable negligence and without authority of law.
 

 The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, ... on or about November 2, 2014, in Attala County, Mississippi, killed Joel McCarty, a human being, without authority of law and by
 
 his
 
 culpable negligence, then the defendant is guilty of Manslaughter and it is your sworn duty to so find.
 

 If the State has failed to prove any one or more of the above listed elements of heat of passion manslaughter or culpable negligence manslaughter beyond a reasonable doubt, then you shall find the defendant not guilty of Manslaughter.
 

 (Emphasis added).
 
 [10]
 
 Thus, the instruction mistakenly referred to "his culpable negligence" rather than "her" (i.e., Grace's) culpable negligence. However, Grace did not raise this issue in the trial court, so any objection is procedurally barred.
 
 See, e.g.
 
 ,
 
 Holliman
 
 ,
 
 178 So.3d at 700
 
 (¶ 24). Indeed, the issue is doubly barred because Grace did not raise the issue on appeal either. The dissent nonetheless contends that the
 mistake amounts to "plain error" requiring a new trial. We disagree.
 

 ¶ 47. "Under our plain-error doctrine, there has to be a finding of error, and that error must have resulted in a manifest miscarriage of justice for reversal to occur."
 
 Williams v. State
 
 ,
 
 134 So.3d 732
 
 , 736 (¶ 15) (Miss. 2014). We will not reverse based on plain error unless the error "prejudiced the outcome of the trial."
 
 Foster v. State
 
 ,
 
 148 So.3d 1012
 
 , 1018 (¶ 20) (Miss. 2014). Moreover, "[t]here is no per se rule requiring automatic reversal whenever jury instructions contain conflicting or potentially confusing explanations of the law."
 
 Rodgers v. State
 
 ,
 
 166 So.3d 537
 
 , 544 (¶ 14) (Miss. Ct. App. 2014) (reading the jury instructions as a whole and holding that an erroneous self-defense instruction did not rise to the level of a "manifest miscarriage of justice" or "plain error"),
 
 cert. denied
 
 ,
 
 166 So.3d 38
 
 (Miss. 2015).
 

 ¶ 48. The one-word mistake in the jury instructions in this case does not rise to the level of plain error. The jury did not submit any questions about culpable negligence. Nor is there any other indication that the instructions confused the jury. Indeed, no one even noticed the mistake until after briefing was complete in this Court. Nonetheless, the dissent speculates that the jury (a) interpreted the mistake as a peremptory instruction to find Grace guilty of manslaughter based on Joel's negligence and (b) returned a guilty verdict on that basis, all without requesting clarification from the trial judge.
 
 Post
 
 at (¶ 80). Surely the idea of convicting the defendant of the victim's negligence would have struck at least some jurors as bizarre and prompted
 
 some
 
 question before they would have rendered a verdict on such a theory.
 
 [11]
 
 The dissent's far-fetched and unsupported speculation does not establish that the "error
 
 must
 
 have resulted in a
 
 manifest
 
 miscarriage of justice."
 
 Williams
 
 ,
 
 134 So.3d at 736
 
 (¶ 15) (emphasis added). Therefore, the plain-error doctrine does not apply.
 

 ¶ 49. Most important, the trial judge properly instructed the jury on the excuse of "accident."
 
 See
 

 Miss. Code Ann. § 97-3-17
 
 (a) - (b) (Rev. 2014). At Grace's request, the judge instructed the jury on two different statutory theories of accident-accident while doing a "lawful act by lawful means, with usual and ordinary caution," and accident "in the heat of passion."
 

 Id.
 

 The judge instructed the jurors that it was their sworn duty to return a verdict of not guilty if there was any "reasonable doubt" as to whether Grace had killed Joel by "accident or misfortune."
 
 See
 
 id.
 

 This was Grace's theory of the case and the critical issue for the jury to decide. Given that the court properly instructed the jury on Grace's theory of the case, the use of the wrong pronoun in the culpable-negligence instruction does not rise to the level of a "manifest miscarriage of justice."
 
 See
 

 Rodgers
 
 , 166 So.3d at 544-47 (¶¶ 14-30).
 

 CONCLUSION
 

 ¶ 50. The conviction is affirmed because the evidence was sufficient to convict Grace of murder or manslaughter; the jury's verdict finding her guilty of manslaughter is not against the overwhelming weight of the evidence; the trial judge did not abuse his discretion by not declaring a mistrial; and the previously unnoticed mistake in the jury instructions does not rise to the level of plain error or a manifest miscarriage of justice.
 

 ¶ 51.
 
 AFFIRMED.
 

 IRVING AND GRIFFIS, P.JJ., BARNES AND FAIR, JJ., CONCUR. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., CARLTON AND WESTBROOKS, JJ. TINDELL, J., NOT PARTICIPATING.
 

 Prior to trial, Grace moved to exclude Jay's testimony, arguing that his impaired memory rendered him incompetent to testify. The trial judge denied Grace's motion after listening to Jay's testimony outside the presence of the jury.
 

 Detective Hill testified that there was video of the family returning home earlier in the day, but that video was not played or introduced into evidence at trial. Detective Hill took possession of the SD card on which footage from the cameras was recorded. An expert in computer forensics testified at trial and confirmed that no other footage from November 2, 2014, had been saved to or deleted from the SD card.
 

 However, in the recording of the 911 call, Grace can be heard saying to Jay, "You were right there with me," and, "You saw what happened."
 

 Accord, e.g.
 
 ,
 
 Cook v. State
 
 ,
 
 467 So.2d 203
 
 , 209 (Miss. 1985) ;
 
 Hubbard v. State
 
 ,
 
 437 So.2d 430
 
 , 438-39 (Miss. 1983) ;
 
 Lowry v. State
 
 ,
 
 202 Miss. 411
 
 , 415-18,
 
 32 So.2d 197
 
 , 198-99 (1947) ;
 
 Adams v. State
 
 ,
 
 199 Miss. 163
 
 , 164-65,
 
 24 So.2d 351
 
 , 351 (1946) ;
 
 Calicoat v. State
 
 ,
 
 131 Miss. 169
 
 ,
 
 95 So. 318
 
 , 321-22 (1923) ;
 
 Holmes v. State
 
 ,
 
 201 So.3d 491
 
 , 494 n.4 (Miss. Ct. App. 2015) ;
 
 Simpson v. State
 
 ,
 
 993 So.2d 400
 
 , 409-10 (¶ 32) (Miss. Ct. App. 2008) ;
 
 Schankin v. State
 
 ,
 
 910 So.2d 1113
 
 , 1118 (¶ 13) (Miss. Ct. App. 2005) ;
 
 see also
 

 Butler v. State
 
 ,
 
 608 So.2d 314
 
 , 320 (Miss. 1992) ("For over a half century, this Court has approved circuit courts granting heat of passion manslaughter instructions to
 
 the State
 
 in a homicide prosecution which is either murder or justifiable homicide committed in lawful self defense, and there is no element whatever of a heat of passion slaying ....");
 
 Taylor v. State
 
 ,
 
 148 Miss. 713
 
 ,
 
 114 So. 823
 
 , 824 (1927) (holding that the same rule applies whether "the defense is self-defense or accidental killing" or "an alibi"). Our Supreme Court has held that manslaughter is considered a lesser-included offense in a murder indictment even when "manslaughter proof is inconsistent with that of murder."
 
 State v. Shaw
 
 ,
 
 880 So.2d 296
 
 , 304 (¶ 27) (Miss. 2004) ;
 
 see also
 

 Miss. Code Ann. § 97-3-19
 
 (3) (Rev. 2014) ("An indictment for murder ... shall serve as notice to the defendant that the indictment may include any and all lesser included offenses thereof, including, but not limited to, manslaughter.");
 
 Miss. Code Ann. § 99-19-5
 
 (2) (Rev. 2015) ("[M]anslaughter shall be considered a lesser included offense of murder and capital murder, and the jury may be properly instructed thereon, upon request by either party or upon the court's own motion, in any case in which the giving of such instruction would be justified by the proof, consistent with the wording of the applicable manslaughter statute."); Michael H. Hoffheimer,
 
 Lesser Included Offenses in Mississippi
 
 ,
 
 74 Miss. L.J. 135
 
 , 165-66 (2004) ("Mississippi ... treat[s] its various forms of manslaughter as lesser included offenses of murder.").
 

 Citing
 
 Yates v. United States
 
 ,
 
 354 U.S. 298
 
 , 312,
 
 77 S.Ct. 1064
 
 ,
 
 1 L.Ed.2d 1356
 
 (1957),
 
 overruled on other grounds by
 

 Burks v. United States
 
 ,
 
 437 U.S. 1
 
 ,
 
 98 S.Ct. 2141
 
 ,
 
 57 L.Ed.2d 1
 
 (1978) ), Grace argues that her conviction must be set aside if there is insufficient evidence of
 
 either
 
 "culpable negligence"
 
 or
 
 "heat of passion." This is incorrect. As the United States Supreme Court explained in
 
 Griffin
 
 , a general guilty verdict must be set aside if one of the possible bases of conviction is held unconstitutional or "contrary to law"-i.e., "
 
 legally
 
 inadequate."
 
 Griffin
 
 ,
 
 502 U.S. at 59
 
 ,
 
 112 S.Ct. 466
 
 (emphasis added). However, when, as in this case, the defendant argues that the case was submitted to the jury on a "
 
 factually
 
 inadequate theory," a general verdict will be upheld as long there was sufficient evidence to support an alternative ground for the conviction.
 

 Id.
 

 (emphasis added).
 

 On this issue, the dissent tracks the arguments of the dissenting opinion in
 
 Little
 
 .
 
 Compare post
 
 at (¶ 81),
 
 with
 

 Little
 
 ,
 
 233 So.3d at 294-96
 
 ,
 
 2017 WL 4546740
 
 , at *6-*7 (¶¶ 32-33) (Kitchens, J., dissenting).
 

 The dissent also states that the video shows Joel sitting "directly" or "immediately" behind the car.
 
 Post
 
 at (¶¶ 64, 80, 86). However, Joel was sitting several feet behind the car-far enough back that he had time to try to dive out of the way after he realized that the car was moving toward him. In addition, the dissent states that Joel was "clearly in the middle of the vehicle's blind spot."
 
 Post
 
 at (¶ 86). However, Grace did not testify that she ever checked her mirrors, and we cannot say, based on the video alone, that Joel was "clearly" in the "blind spot." Finally, the dissent states that Grace "attempted to render aid to Joel" after she ran over him.
 
 Post
 
 at (¶ 53). However, no rendering of aid can be seen in the video, and Grace testified only that she called 911.
 

 In general, the jury could have found that the testimony of Patricia and Grace's mother was biased and not credible.
 
 See, e.g.
 
 ,
 
 Stevenson v. State
 
 ,
 
 738 So.2d 1248
 
 , 1252 (¶ 19) (Miss. Ct. App. 1999) (refusing "to disturb the verdict of [the] jury," which was entitled to find "the State's witnesses more credible than [the defendant] and his three witnesses who, on the face of it, were subject to claims of bias by virtue of their family and emotional ties to the defendant");
 
 see also, e.g.
 
 ,
 
 Bergmann v. McCaughtry
 
 ,
 
 65 F.3d 1372
 
 , 1380 (7th Cir. 1995) ("family members can be easily impeached for bias").
 

 The jury reasonably could infer that it was Grace who raised her voice and not ten-year-old Patricia.
 

 The court also instructed the jury that "culpable negligence" is "negligence so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life."
 

 Notably, the jurors did send the judge a question about the definition of "heat of passion" and the elements of heat-of-passion manslaughter.