# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00872-COA

**MICHAEL HOLLAND**                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/28/2017 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ALI MUHAMMAD SHAMSIDDEEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/04/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., GREENLEE AND McDONALD, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     One man was killed and three others were seriously injured in a drive-by shooting on Highway 82 outside Itta Bena, Mississippi. Jacarius Keys provided a statement to law enforcement, implicating himself and four other men in the shooting—Sedrick Buchanan, Michael Holland, Armand Jones, and James Earl McClung Jr. In July 2016, all five men were co-indicted for the murder and attempted murders of the vehicle's occupants. On December 28, 2016, Keys was killed. The remaining co-indictees were tried together in the Leflore County Circuit Court in May 2017. After a four-day trial, the jury found Holland

guilty of second-degree murder and of three counts of attempted first-degree murder.[1] Holland was sentenced to serve forty years in the custody of the Mississippi Department of Corrections (MDOC) for the second-degree murder conviction and three terms of thirty years in the MDOC's custody for his other convictions, with all sentences set to run consecutively. He appeals his convictions, and finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     At 11:00 p.m. on August 15, 2015, D'Alandis Love, Perez Love, and their cousins, Kelsey Jennings and Ken-Norris Stigler,[2] were traveling west on Highway 82 in "Munchie" Brown's red Pontiac when a light-colored Tahoe sped past them, spraying bullets into the car. D'Alandis was killed, and Perez, Jennings, and Stigler were seriously injured.

¶3.     Keys and his lawyer went to the Leflore County Sheriff's Office to give a statement regarding the incident. The chief investigator, Bill Staten, interviewed Keys on September 2, 2015, but after the video equipment failed during that interview, Investigator Staten re-interviewed Keys, again with counsel, on September 3. Keys said that he was driving the Tahoe. He also implicated Buchanan, Holland, Jones, and McClung in the shooting. In July 2016, all five men were indicted for "acting alone or in concert with each other or others"

---

[1] Holland's co-defendants—McClung, Buchanan, and Jones—were also found guilty and have appealed their convictions and sentences. Initially, these appeals were docketed by the Supreme Court Clerk under case number 2017-TS-1053. After assignment, this Court entered an order keeping McClung's appeal under case number 2017-KA-1053-COA and assigning a new case number to Buchanan's and Jones's appeals.

[2] We will collectively refer to all four men as the Loves.

2

on one count of deliberate-design murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014) and three separate counts of attempted murder in violation of Mississippi Code Annotated sections 97-1-7 (Rev. 2014) and 97-3-19(1)(a).

¶4. Keys was killed on December 28, 2016. Prior to trial, the defendants moved to exclude Keys's videotaped statement and sever the trial. The trial court denied the defendants' motions. Jones, Buchanan, McClung, and Holland were tried before a Leflore County Circuit Court jury in May 2017, each represented by his own counsel.

¶5. Matthew Brown, a deputy with the Leflore County Sheriff's Office, testified that he was on patrol on August 15 when he discovered a car on fire in a field off Highway 82. Deputy Brown helped Perez get out through the car window, and he also pulled Stigler and D'Alandis out of the vehicle.[3] Deputy Brown radioed for emergency services, and after realizing that it was "not just a car wreck," he called the sheriff and investigators.

¶6. Staten, the chief investigator, testified that he responded to the scene at approximately 12:20 a.m. and approached the Pontiac. Investigator Staten observed what he believed were gunshot wounds on D'Alandis's body. D'Alandis was later pronounced dead at the scene.[4] The other three victims had already been transported to the hospital. Investigator Staten said he "noticed bullet holes on the driver's side of the vehicle, . . . and along the rear passenger door the driver's window had been shot out and there were other bullet holes along that side

---

[3] Jennings was already outside of the vehicle.

[4] Lisa Funte, a medical examiner, testified D'Alandis died as a result of multiple gunshot wounds, and his manner of death was homicide.

of the vehicle." He took photographs and collected evidence, including a number of 7.62mm shell casings and one .40-caliber shell casing recovered within the immediate area of where the vehicle had left the highway. The next morning, after the vehicle had been towed to a secure location, Investigator Staten retrieved a .40-caliber Smith & Wesson pistol from the Pontiac. Mark Steed, an investigator with the Mississippi Bureau of Investigations (MBI), also assisted with the investigation and identified the handgun that Investigator Staten recovered from the Pontiac.

¶7. Investigator Staten testified that Jasmine Cage, Perez's girlfriend, was at the scene of the incident. She told a deputy that she knew the people in the car and had witnessed the shooting. Cage was transported to the Sheriff's Office so that Investigator Staten could take her statement.

¶8. Amber Conn, a crime scene analyst with the MBI, was accepted as an expert in crime-scene investigation. Conn opined that the Pontiac was shot from the back toward the front on the driver's side. During her investigation, Conn recovered another .40-caliber Smith & Wesson pistol from the front passenger floorboard of the Pontiac. Conn testified that the gun was fully loaded (one bullet was in the chamber), and its safety was locked when she found it.

¶9. Starks Hathcock was accepted as an expert in firearms and tool-marks identification. Examining both .40-caliber pistols recovered from the Pontiac and comparing them to the .40-caliber bullet recovered from Perez's head, Hathcock was able to confirm that the bullet

4

was not shot by either of the guns recovered from the Pontiac. He also examined the .40-caliber pistol recovered when Buchanan was stopped after his arrest, while out on bond. Hathcock testified that he could not positively determine whether that gun had fired the recovered shell casing; however, the gun could not be excluded as having done so. Hathcock also testified that the 7.62mm (.30-caliber) shell casings recovered from the highway could have been fired from an AK-47 or SKS—a semiautomatic assault rifle "designed for war." However, he could not link the .30-caliber shell casings recovered to a specific weapon. Hathcock did testify that the projectile jackets recovered from the Pontiac bore similar characteristics to the bullets recovered from D'Alandis's right chest and his right leg.

¶10. Bentravious "Munchie" Brown testified that on the night of the incident, he had loaned his car, a red Pontiac Grand Prix, to the Loves. He testified that Perez drove the vehicle and that the group headed to a club at around 11:00 p.m. Jasmine Cage testified that on the night of the shooting, she had followed Perez and the others in Brown's car to "make sure Perez was not going to the club." She saw the Pontiac ahead of her on Highway 82 and saw a Tahoe or Yukon pass her on the right. After testifying that she could not see who was in the Tahoe/Yukon and did not know the color of the vehicle, Cage was reminded about her statement given to Investigator Staten. Cage thereafter testified that she had told Investigator Staten she thought the vehicle was gold and that she saw Jones, Keys, David Reedy, and Holland in the vehicle. She thought Jones was in the front passenger seat, and Holland was seated in the back on the passenger side. On cross-examination, Cage confirmed that she

5

knew Buchanan and that she did not see him in the vehicle that night.

¶11.    Cage also testified she told Investigator Staten that Reedy had been driving the Tahoe/Yukon and that Keys was in the backseat on the driver's side. After the Tahoe/Yukon passed her, she saw "sparks like fire" a far distance in front of her. Cage called Perez's friend to ask him whether gunshot looks like fire at nighttime, and he said that it did. Cage continued to the Moroccan Lounge, but when the Pontiac failed to show up, she turned around and headed back to Greenwood. On her way, she saw the Pontiac in a ditch; so she stopped her car and approached the scene.

¶12.    Two of the victims, Stigler and Perez, testified that the shooters were traveling in a beige or gold Tahoe-type vehicle and that Jones and Holland were the ones who shot bullets at them.[5] Perez said he saw Jones in the Tahoe with a "baby assault rifle," sometimes called "a mini-Draco." Both Stigler and Perez saw Holland with a pistol as the Tahoe passed them. Stigler also testified that he saw Jones shoot Perez in the top of the head.

¶13.    Although Perez testified that he could not positively identify anyone besides Holland and Jones in the vehicle, he acknowledged that he had identified other people, including Reedy and Keys, in his statement after the incident.[6] Perez explained that he identified the people in the Tahoe because he saw "all of them" riding in the vehicle every day, and he

[5] Although Jennings testified, he could not identify anyone in the Tahoe.

[6] Investigator Staten testified that he thought Perez had also identified Buchanan, though he was not sure. Defense counsel specifically questioned Perez about whether he had identified Buchanan, but Perez said he never saw Buchanan and, other than Jones and Holland, could not recall whom he had previously identified.

thought they were in the vehicle that night. But Perez said that after he thought about it more, he realized that he never actually saw anyone other than Jones and Holland. On cross-examination, Perez also testified that he thought Reedy was in the Tahoe because Reedy used to own the Tahoe.

¶14.	Because Keys was not available at trial, his videotaped statement was admitted into evidence and was played for the jury.[7] Keys said that he was driving the gold Tahoe on the night of the shooting. He stated that Holland and Jones were on the passenger side, McClung was in the rear seat on the driver's side, and Buchanan was sitting in the third-row seat.[8] Keys, Buchanan, Holland, Jones, and McClung had been at Holland's house that evening, and, around 11:00 p.m., they left in Keys's Tahoe to go to the Moroccan Lounge.

¶15.	Keys said Jones brought his AK-47 with him, which was described as being "short with a long magazine." Keys did not know Jones had the gun until "he first upped it" (meaning until Jones began shooting). Keys also said that Jones had the AK-47 that night because "he always had it." Keys was unsure whether anyone else had a weapon. At the end of his statement, Keys said that no one had a gun except Jones. Keys said that there had been no previous discussion of any retaliation against the Loves. However, when questioned about Jones, Keys said that Jones had said "days earlier" that he needed to get one of them

---

[7] The jury was not told that Keys had been killed.

[8] In comparison, Cage and Perez identified Reedy as driving the vehicle, with Keys in the backseat. In his statement, Keys said that he was driving and that Reedy was not with them. Although Reedy was questioned, there was evidence that he was in Batesville near the time of the incident.

(the Loves) because they (the Loves) "had got some of their friends." As they drove down Highway 82, they approached a car, and Jones called out that it looked like the Loves in that car.[9] As they passed the vehicle, according to Keys, Jones rolled down the window, leaned out the window, and opened fire with his AK-47. As soon as Jones started shooting, Jones told him, "Go, go, go," and Keys sped up to get away.

¶16. Keys said that Holland made a phone call to arrange for someone to get rid of the car. Keys drove to Moorhead, Mississippi, and a mechanic that Holland knew met them in a grey Nissan. The mechanic took Keys's Tahoe, and Keys and the others left in the Nissan. The Tahoe was never recovered.

¶17. After switching vehicles, they went to a Best Western hotel in Greenwood. When they got to the hotel, Jones brought his gun in with him. Holland and Jones later left together, but Jones returned a short while later without his gun. Keys, Buchanan, Jones, and McClung spent the night at the Best Western. The next morning, Jones arranged for his own ride home, and Keys, Buchanan, and McClung got a ride together. Keys stayed with his mother for several days after the shooting until he got a lawyer and turned himself in. While Keys was at his mother's home in Tennessee, Jones contacted him from a phone that Keys did not recognize and said he was in Chicago. When Keys gave his statement on September

---

[9] Keys said that he did not recognize the car. Perez, however, said in his pretrial statement that Keys was standing outside before Perez and the others had left for the club. When questioned about that statement at trial, Perez testified that his statement was wrong and that he meant to say it was "Munchie" (Brown) standing outside, not Keys.

3, 2015, he had not spoken with anyone else involved in the incident. However, after providing his statement to law enforcement, Keys approached Jones's lawyer and informed him that he had given an incriminating statement. Buchanan turned himself in on September 18, 2015, and Holland was arrested shortly thereafter.

¶18. After the State rested, defense counsel for Buchanan, Holland, Jones, and McClung moved for directed verdicts, which the trial court denied. None of the defendants testified or presented any other evidence. The jury found each of the defendants guilty of various offenses. Relevant to this appeal, the jury found Holland guilty of second-degree murder and of three counts of attempted first-degree murder. For the second-degree murder conviction, Holland was sentenced to serve forty years in the custody of the MDOC. He was sentenced to serve three terms of thirty years in the MDOC's custody for his remaining convictions, with all sentences to be served consecutively. On June 8, 2017, Holland filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, which the trial court denied.

¶19. Appealing his convictions, Holland lists several issues in the "Statement of Issues" portion of his appellant's brief. However, with respect to four of the issues, he cites no authority and provides no argument.[10] *See Arrington v. State*, 267 So. 3d 753, 756 (¶8) (Miss. 2019) ("The law is well established that points not argued in the brief on appeal are

---

[10] These issues are whether the trial court erred (1) in denying the motion to change venue; (2) in failing to grant an order refuting any gang affiliation; (3) in allowing witness intimidation; and (4) in failing to exclude Keys's videotaped statement.

abandoned and waived."). Therefore, we will limit our review to the remaining issues argued by Holland: (1) whether the court erred in denying his motion to sever the trial; and (2) whether the evidence was insufficient to support the verdict or, in the alternative, whether the verdict was against the overwhelming weight of the evidence.

## DISCUSSION

### I.     Denial of the Motion to Sever

¶20.    Holland asserts that the trial court erred in denying his motion to sever. The only argument he makes on this issue, however, is his citation to factors a trial court may consider in determining whether to grant a motion to sever, as outlined by the Mississippi Supreme Court in *Duckworth v. State*, 477 So. 2d 935, 937 (Miss. 1985). Holland has not applied this authority to the facts of the case; therefore, he has waived this issue on appeal. *See Doss v. State*, 956 So. 2d 1100, 1103 (¶8) (Miss. Ct. App. 2007) ("[T]he failure to . . . make any meaningful argument constitutes a waiver of any issues which may have been properly presented to this Court for our review.").

¶21.    Nevertheless, we find the trial court did not err in denying Holland's motion to sever the trial. "Defendants jointly indicted for a felony are not entitled to separate trials as a matter of right." *Maggett v. State*, 230 So. 3d 722, 727 (¶12) (Miss. Ct. App. 2016). "[J]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling a more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Id.* (quoting *Cavett v. State*, 717 So. 2d 722, 727 (¶30) (Miss.

10

1998)). Uniform Rule of Circuit and County Court Practice 9.03, which was applicable when Holland and his co-defendants were tried in May 2017,[11] states:

> The granting or refusing of severance of defendants in cases not involving the death penalty shall be in the discretion of the trial judge. The court may, on motion of the state or defendant, grant a severance of offenses whenever:
>
> 1.     If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense . . . .

URCCC 9.03. In reviewing the denial of a motion for severance, we consider two criteria: "(1) whether the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant and (2) whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other." *Hayes v. State*, 168 So. 3d 1065, 1074 (¶34) (Miss. Ct. App. 2013) (internal quotation marks and citation omitted). Thus, under this test, as articulated in *Duckworth*, 477 So. 2d at 937, Holland must show that he was prejudiced by the trial court's refusal to grant his motion for severance.

¶22. Regarding the first factor, Holland does not argue that Keys's statement was exculpatory, and none of the remaining defendants testified at trial. Therefore, the first factor weighs in favor of a joint trial because one defendant's testimony could not be used to exculpate himself at the expense of the other co-defendants. The second factor also weighs in favor of a joint trial. Both Jones and Holland were identified at trial as shooters, and all of the defendants were charged with acting in concert with respect to the shooting.

---

[11] The Mississippi Rules of Criminal Procedure did not become effective until July 1, 2017.

Accordingly, we find the court did not abuse its discretion in denying the motion for severance.

## II. The Sufficiency and Weight of the Evidence

¶23. Holland claims that the evidence is insufficient to support the verdict "because the testimony of the witnesses [was] uncorroborated by any credible evidence and is in fact discredited by much of the evidence presented at trial." Holland further argues that the testimony by the victims and Cage was "unsupported," "contradictory," and "inconsistent with one another" and that there was no physical evidence that Holland was guilty of second-degree murder and attempted murder.

¶24. When addressing a challenge to the sufficiency of the evidence, "the question is not whether this Court 'believes that the evidence at trial established guilt beyond a reasonable doubt . . . [but] whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *McCarty v. State*, 247 So. 3d 260, 268 (¶23) (Miss. Ct. App. 2017) (emphasis omitted) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d 288, 289-90, 291-93 (¶¶1, 14-21) (Miss. 2017)). A challenge to the weight of the evidence, on the other hand, "is separate and distinct from a challenge to the legal sufficiency of the evidence, in that it seeks a new trial." *Brown v. State*, 269 So. 3d 1262, 1264-65 (¶9) (Miss. Ct. App. 2018) (internal quotation mark omitted) (quoting *Bradford v. State*, 102 So. 3d 312, 316 (¶16) (Miss. Ct. App. 2012)).

12

Viewing the evidence in the light most favorable to the verdict, we will not disturb a verdict on appeal unless it "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

¶25.    Holland was convicted of second-degree murder and of three counts of attempted murder.  Second-degree murder is defined as "[t]he killing of a human being without the authority of law . . . in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ."  Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014).  "The Supreme Court has described conduct 'evincing a depraved heart' as 'grave recklessness manifesting utter disregard or indifference to a resultant creation of eminent danger to human life.'"  *McCarty*, 247 So. 3d at 269 (¶27).  With regard to the attempted-murder charges, the State had to prove beyond a reasonable doubt, based on the indictment, that Holland "willfully, unlawfully, purposely, knowingly and feloniously design[ed] and endeavor[ed] or attempt[ed] to kill [Perez, Stigler, and Jennings] . . . without the authority of law and not in necessary self defense."

¶26.    During cross-examination, Investigator Staten acknowledged that Keys did not indicate in his statement that Holland was a shooter:

    Q.    Did Mr. Keys say that Mr. Holland was shooting?

    A.    Mr. Keys indicated in his statement that the only person he knew was shooting was [Jones].

Keys did say, however, that Holland was seated on the passenger side of the Tahoe.  Cage

13

also testified that she thought she saw Keys, Reedy, Holland, and Jones in the Tahoe when they passed her and that Holland was seated in the back seat of the Tahoe on the passenger side.

¶27. It was the testimony of two of the victims, Stigler and Perez, that provided evidence Holland was firing a gun at the Pontiac. Stigler testified that Holland "had a pistol in his hand shooting, too." Perez, the driver of the Pontiac, said that Jones and Holland were "[h]anging out the window" with guns in their hands and that he had no doubt who was in the Tahoe and who had shot at him and his friends.[12]

> Q. Do you have any doubt in your mind about who was in the gold Tahoe and who shot at your car?
>
> A. No, ma'am.
>
> Q. No doubt whatsoever? I need you to say it out loud.
>
> A. No, sir.
>
> Q. Who shot you?
>
> A. Depending on what kind of gun they said was used and the bullet they took out my head, it was a .40[-]caliber and the handgun I seen Michael

---

[12] Holland contends that "[a]lthough evidence was presented which showed that a homicide took place, the State presented absolutely no evidence that corroborated the testimony that Mr. Holland murdered or attempted to murder anyone as required by Mississippi law." To the extent Holland suggests that he was not the shooter who killed D'Alandis, under the accomplice theory of liability, the jury could convict Holland of murder as a principal even if it believed another defendant killed D'Alandis. *See* Miss. Code Ann. § 97-1-3 (Rev. 2014) (providing that any person who is an accessory to a felony before the fact "shall be deemed and considered a principal, and shall be indicted and punished as such").

Holland holding. So that's who shot me.

Q.     What about who shot at your car?

A.     Both of them, Armand Jones and Michael Holland.

The physical evidence retrieved from the scene of incident included .40-caliber shell casings, and a .40-caliber bullet was recovered from Perez's head.

¶28.   On review, this Court is required to accept as true the evidence that supports the verdict. *Smith v. State*, 180 So. 3d 771, 773 (¶11) (Miss. Ct. App. 2015). In this case, we find no inconsistency or contradiction in the evidence as Holland claims. Except for Jennings, who could not confirm the identity of anyone in the Tahoe, the witnesses to the shooting said Holland was in the Tahoe seated on the passenger side of the car behind Jones. Two of the victims said Holland had shot at them. Keys also provided evidence through his statement that Holland was instrumental in getting rid of the Tahoe after the shooting.[13]

---

[13] As noted, Holland has failed to cite any authority or argument concerning the admissibility of Keys's statement. Regardless, to the extent that the statement supports Holland's convictions, we find no error in the trial court's admission of Keys's statement against Holland under Mississippi Rule of Evidence 804(b)(6), which codifies the doctrine of forfeiture by wrongdoing. *See Davis v. Washington*, 547 U.S. 813, 833 (2006). Rule 804(b)(6) "applies only when the defendant 'engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.'" *Giles v. California*, 554 U.S. 353, 367 (2008) (quoting Fed. R. Evid. 804(b)(6)). "The party offering this evidence must make this showing by a preponderance of the evidence." *United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018). In this case, the State provided surveillance-video evidence showing Holland chasing Keys with a gun mere moments before Keys was shot and killed. Furthermore, Sergeant Bankston, the investigator for Keys's murder, testified that both Holland and Buchanan were suspects in Keys's murder and that Holland received a text from Buchanan on Jones's cell phone after Buchanan was arrested and in jail for Keys's murder. Based on these circumstances, we find the trial court could reasonably

15

Holland's witness-credibility argument was a matter for the jury, who is "the ultimate decision-maker as to what weight and worth" to give said testimony. *McCarty*, 247 So. 3d at 270 (¶32).

¶29. Finding that there was sufficient evidence to support the verdict and that the verdict was not against the overwhelming weight of the evidence, we affirm Holland's convictions and sentences.

¶30. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

---

infer, based upon a preponderance of the evidence, that Holland killed Keys to prevent him from testifying and/or was part of a conspiracy to do so.