# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00684-COA

**JERRY DALE MILLER**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:            03/07/2018
TRIAL JUDGE:                HON. THOMAS J. GARDNER III
COURT FROM WHICH APPEALED:  ALCORN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
                            BY: HUNTER NOLAN AIKENS
                                GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: SCOTT STUART
DISTRICT ATTORNEY:          JOHN WEDDLE
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 12/10/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., TINDELL AND LAWRENCE, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     An Alcorn County jury convicted Jerry Miller of the second-degree murder of Greg Scott. The Alcorn County Circuit Court sentenced Miller to forty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended, thirty years to serve, and five years of post-release supervision. The circuit court also fined Miller $5,000 and ordered him to pay $200 to the Corinth Police Department's investigative fund. On appeal, Miller argues (1) the jury's verdict was against the overwhelming weight of the evidence; (2) the circuit court erred by allowing a lay witness to give an expert opinion; and

(3) the circuit court erroneously admitted a photograph that was substantially more prejudicial than probative. Finding no reversible error, we affirm Miller's conviction and sentence.

**FACTS**

¶2. In June 2013, Leah McIntosh moved to Corinth, Mississippi, to start her medical residency at Magnolia Hospital. Leah bought a home next door to Greg and his wife Marla Scott and directly in front of Miller's home. In early February 2014, Ashleigh Ortner and her newborn daughter moved into Leah's home. Around midnight on February 27, 2014, a noise woke Ashleigh. When she looked outside, Ashleigh saw a man dressed in a dark hoodie. Ashleigh also observed damage to her vehicle. Although Ashleigh thought the man had thrown something at her vehicle, she testified that she could not identify the object. Ashleigh and Leah called 911.

¶3. Corinth police officer James Tucker responded to Ashleigh and Leah's call. Officer Tucker discovered a VCR/DVD player in Ashleigh and Leah's driveway and observed damage to both women's vehicles. Officer Tucker then heard screams from the house next door. Officer Tucker arrived at the Scotts' house to find Greg lying on the floor bleeding. Officer Tucker testified that Greg said, "The pervert down the road stabbed me." Although Greg attempted to say more, Officer Tucker stated that he was unable to do so. After instructing another officer to remain with the Scotts, Officer Tucker returned to Leah's home and asked whether Leah and Ashleigh had encountered any problems with their neighbors. He also asked the women if they knew who had been responsible for the night's events.

2

Leah and Ashleigh told Officer Tucker about the man who lived in the house directly behind them, whom they referred to as "[t]he pervert next door." Officer Tucker shared the information he had learned over his radio with the other responding officers.

¶4. Officers Kenneth Edmonds, Bo Swindle, and Steve Rose also responded to Ashleigh and Leah's call. Upon arriving at the crime scene, Officer Edmonds learned about the stabbing and was informed that the suspect might still be in the area. Along with Officers Rose and Swindle, Officer Edmonds walked toward the home directly behind Leah's home where the suspect, later identified as Miller, was believed to live. Both Officers Edmonds and Swindle testified that they observed drops of blood and a pair of glasses in the road as they walked toward Miller's home.

¶5. As the officers approached Miller's home, the porch lights switched on, and Miller walked onto the front porch. Both Officers Edmonds and Swindle testified that Miller spontaneously and voluntarily confessed to stabbing Greg. Officer Edmonds testified that Miller said, "I know why you're here. I stabbed the guy up the street." Officer Edmonds stated that Miller also said he had "stabbed a man up the road because they had been cyberstalking him and messed up his VCR." Similarly, Officer Swindle testified that Miller said, "I confess. The knife is under my bed. They were cyberstalking my DVD player." In addition, Officer Edmonds stated that Miller mentioned his glasses had been knocked off earlier that night.

¶6. Officer Swindle asked Miller to approach him, and when Miller did so, Officer Swindle handcuffed Miller and searched him for weapons. Both Officers Edmonds and

3

Swindle testified that Miller responded "sure" when Officer Rose asked for permission to enter Miller's house to retrieve the knife. The three officers entered Miller's home and found a long knife with blood on it under Miller's bed. As soon as the officers found the knife, Officer Swindle stated that he went back outside and read Miller his *Miranda*[1] rights.

¶7.    After hearing over his radio that other officers had taken a suspect into custody and had read the suspect his *Miranda* rights, Officer Tucker walked over to Miller's home. Upon reaching Miller, Officer Tucker asked Miller about what had taken place. Officer Tucker testified that Miller started "talking about the Chinese and [the] Russians cyberstalking his VCR . . . ." When Officer Tucker asked more specifically about what had happened between Miller and Greg, Miller responded, "We got into it[,] and I stabbed him."

¶8.    Corinth Police Chief Ralph Dance, who worked as a detective at the time of Greg's stabbing, also responded to Ashleigh and Leah's call. Chief Dance testified that he interviewed witnesses at the crime scene and photographed evidence. After leaving the crime scene, Chief Dance later interviewed Miller at the police station around 10:35 a.m. Although Miller had waived his *Miranda* rights around 12:30 a.m. that same morning, Chief Dance had Miller sign another *Miranda*-rights waiver form before their interview. Detective Fred Serio witnessed Miller waive his *Miranda* rights and was present during the videotaped interview, which was introduced at trial and played for the jury.

¶9.    During the interview, Miller told Chief Dance that he had been listening to voices "on each side of . . . [his] ear for going on six years" and that the voices had led him to believe

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

"the house behind . . . [him] was heavily involved in trying to hurt" him. Miller stated this made him angry so he walked over to Leah's home with a knife, which he claimed he planned to use to scare Leah and Ashleigh if they walked out of their house. Miller stated that he threw rocks through the windows of Leah's and Ashleigh's vehicles and that Greg then came outside to confront him. Miller stated that Greg punched him in the face, which cut Miller's ear and broke his glasses. After Greg hit him, Miller stated that he pushed Greg down. Miller admitted that he was still holding the knife, but he denied using the knife to stab Greg. Miller claimed that the confrontation ended after he pushed Greg and that he and Greg each walked back to their respective houses.

¶10.    At Miller's trial, Leah testified about her various interactions with Miller. Leah testified that she had encountered Miller several times while working in her backyard and that Miller once asked her for some towels when his house flooded. On another occasion, Leah arrived home from work to find a note on her door with Miller's signature and phone number on it. On yet another occasion, Leah was working in her backyard when Miller approached the fence and stated, "You know, you're going to end up marrying me and having my kids." Leah told Miller that she was not interested. She testified that she then went over to the Scotts' house and told them that, if anything ever happened to her, she wanted them to know Miller was "really creeping . . . [her] out." Leah stated that Greg told her not to worry because he had her back. Despite her statement to the Scotts, Leah testified at trial that Miller had never done anything that made her fear for her physical safety or that suggested physical aggression toward her.

5

¶11. On direct examination, the State asked whether Leah had much experience with people who had mental illnesses. Leah answered affirmatively and responded that she handled all the court commitments for Alcorn, Tishomingo, Itawamba, and Tippah Counties. Leah testified that she performed psychiatric evaluations for the court and would offer her opinion as to whether the people she evaluated were a danger to themselves or others and should be committed. The following exchange then occurred:

| [PROSECUTOR]: | Okay. So the experience that you've had with people with mental illness and based on your experiences with the defendant . . . . while you were living there, did he at any time appear to be so out of his mind that he didn't know what was going on? |
| --- | --- |
| [DEFENSE ATTORNEY]: | Judge -- |
| [LEAH]: | No, sir, never. |
| [DEFENSE ATTORNEY]: | -- at this point I'm going to interpose an objection. I understand Dr. Mc[I]ntosh . . . may very well be trained in the field of psychiatry and may very well offer opinions with regard to civil commitments. However, for the purpose, I think, of answering the question which has been posed, she hasn't been properly tendered and accepted as an expert. |
| [PROSECUTOR]: | We're not offering her opinion as an expert, Your Honor. Our jurisprudence is replete with instances . . . [where] proof of insanity or lack of insanity can be made by lay witnesses based on their observations of the defendant. |
| THE COURT: | If that's an objection, Counsel, overruled. You may proceed. |

| | |
|---|---|
| [DEFENSE ATTORNEY]: | Thank you, sir. |
| [PROSECUTOR]: | So based on your experiences with the defendant, did you find him to be so deranged and without possession of his faculties that he didn't know what he was doing and he didn't know right from wrong or what was going on? |
| [LEAH]: | No, sir. I would not have recommended him for any kind of psychiatric issues from when I met him. |
| [PROSECUTOR]: | Okay. So he appeared to you to be -- |
| [LEAH]: | He kept it together when I was around. |
| [PROSECUTOR]: | Okay. |
| [LEAH]: | Very normal. He just creeped me out. |

¶12.   Greg's wife, Marla, also testified during the State's case-in-chief. Marla recalled Leah approaching her and Greg one day and asking them to keep an eye on her house because Miller "was creeping her out." Marla testified that Miller had also once made her feel uncomfortable when he came to her house to speak to her. On the occasion in question, Miller seemed very interested in Leah and Ashleigh and had invaded Marla's personal space when he spoke to her. Marla stated that Miller did not, however, say anything that led her to believe he was crazy or out of his right mind. On the night of the stabbing, Marla was asleep when she heard Greg call her name. She testified that she got up and found Greg lying on the floor bleeding. Greg told Marla that "[t]he pervert stabbed me." Marla testified that Greg repeated this statement to the police when they arrived. Marla further testified that Miller was the "pervert" to whom Greg referred.

¶13. Greg's father, Greg Scott Sr. (Senior), testified that he lived directly in front of Greg and Marla's home. Senior testified that he knew Leah and Ashleigh and had engaged in casual conversation with Miller prior to the night of the stabbing. In the approximately three years that he had lived next door to Miller, Senior testified that Miller had never said anything that caused him to think Miller was insane. Senior did state, however, that his wife had described Miller as "creepy." Senior further stated that Greg had not been a violent person and that, as far as he knew, Greg had never had any problems with Miller.

¶14. Dr. John Davis, who was tendered as an expert in forensic pathology, testified about Greg's autopsy results. Dr. Davis stated that Greg died from a stab wound to his upper-right abdomen that penetrated his liver. During Dr. Davis's testimony, the State introduced into evidence three photographs taken during Greg's autopsy. The first image showed the right side of Greg's torso where he was stabbed, the second image provided a close-up shot of the stab wound, and the third image, taken after the removal of Greg's liver from his body, depicted the damage inflicted to Greg's liver by the stab wound. Dr. Davis testified that the knife found under Miller's bed was consistent with the type of weapon that could have inflicted the stab wound to Greg's torso and liver. After Dr. Davis's testimony, the circuit court provided a cautionary instruction to the jury regarding the photo of Greg's liver.

¶15. Dr. Criss Lott testified as an expert in forensic psychology. At the circuit court's request, Dr. Lott had examined Miller on February 17, 2016, to determine (1) Miller's mental state at the time of the alleged offense; (2) whether Miller was competent to stand trial; and (3) whether Miller could have knowingly, intelligently, and voluntarily waived his rights

8

when he made a statement to officers. After interviewing Miller, Dr. Lott concluded the following: (1) Miller was competent to stand trial; (2) Miller understood his actions in breaking the windows of Leah's and Ashleigh's vehicles; and (3) he was unable "to offer an opinion with certainty regarding . . . [Miller's] appreciation or awareness of the wrongfulness of his actions regarding the murder." Dr. Lott stated, "I couldn't state with certainty that he knew that he had actually assaulted the individual and that the assault resulted in the death of this man." Dr. Lott testified that Miller suffered from schizophrenia, had a history of noncompliance in taking his medication, and had a history of cannabis use and abuse. When asked whether he could form an opinion based on a reasonable psychological certainty as to Miller's mental state at the time of the stabbing, Dr. Lott responded that he could neither opine with any certainty about Miller's legal sanity at the time of the stabbing nor rule out the possibility that Miller had been legally insane at that point in time.

¶16. After considering the testimony and evidence presented, the jury convicted Miller of second-degree murder, and the circuit court sentenced Miller to forty years in MDOC's custody, with ten years suspended, thirty years to serve, and five years of post-release supervision. The circuit court also fined Miller $5,000 and ordered him to pay $200 to the Corinth Police Department's investigative fund. Miller filed an unsuccessful new-trial motion. Aggrieved, he appeals.

**DISCUSSION**

### I. Weight of the Evidence

¶17. Miller argues the jury's verdict was against the overwhelming weight of the evidence.

9

Specifically, Miller contends the evidence established that, at the time the stabbing occurred, he (1) acted in reasonable self-defense; (2) acted in the heat of passion; or (3) was insane. As this Court has explained:

> In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only when the verdict is contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Blanden v. State*, 276 So. 3d 1204, 1208 (¶8) (Miss. Ct. App. 2018) (citation and internal quotation marks omitted).

### a.       Self-Defense and Heat of Passion

¶18.    Miller claims the evidence presented at trial demonstrated that Greg "was a large man who attacked Miller and punched him [in] the face, breaking his glasses and cutting his ear." Miller further asserts "[t]hese circumstances provided reasonable grounds for Miller to apprehend an imminent threat of serious bodily harm" that established he acted in reasonable self-defense when he stabbed Greg. Alternatively, Miller argues the evidence showed that he acted in the heat of passion when he stabbed Greg and that, at most, he was guilty of manslaughter rather than second-degree murder.

¶19.    We define heat-of-passion manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2014). We have described "heat of passion" as follows:

> [A] state of violent and uncontrollable rage engendered by a blow or certain

other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment[,] or terror.

*Blanden*, 276 So. 3d at 1208 (¶10). Furthermore, we have stated:

Manslaughter must be in the heat of passion, i.e. the result of immediate and reasonable provocation, by words or acts of one at the time. There must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment.

*Id.* at 1209 (¶17) (citation and internal quotation marks omitted).

¶20.    By contrast, we define second-degree murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014). "Depraved-heart murder encompasses a reckless and eminently dangerous act directed toward a single individual, from which malice is implied." *McCarty v. State*, 247 So. 3d 260, 269 (¶27) (Miss. Ct. App. 2017) (internal quotation marks omitted).

¶21.    Here, the State entered into evidence Miller's videotaped interview with Chief Dance. Miller told Chief Dance that on the night of the stabbing he became angry and walked over to Leah's house with a knife. Miller claimed that he took the knife with him to scare Leah and Ashleigh if they walked out of their house. When he arrived at Leah's home, Miller threw rocks through the windows of Leah's and Ashleigh's vehicles. After damaging the

women's vehicles, Miller stated that he encountered Greg, who asked what he was doing. According to Miller's statement, Greg hit him, Miller pushed Greg away from him, and then both Greg and Miller walked to their respective houses.

¶22. On appeal, Miller claims that he stabbed Greg in either reasonable self-defense or in the heat of passion. During his interviews and statements to police, however, Miller failed to assert either of these claims. In fact, in his separate interviews with Chief Dance and Dr. Lott, Miller repeatedly denied that he ever used his knife to stab Greg. Despite Miller's denials in his interviews, the jury heard testimony that Greg identified "the pervert" as his attacker and that Miller was "the pervert" to whom Greg referred. The jury also heard testimony from both Officers Edmonds and Swindle that, just after the stabbing occurred, Miller spontaneously and voluntarily confessed to them that he had stabbed Greg and that the knife he had used was under his bed. Officer Edmonds testified that Miller said, "I know why you're here. I stabbed the guy up the street." Officer Edmonds also stated that Miller admitted he had "stabbed a man up the road because they had been cyberstalking him and messed up his VCR." Similarly, Officer Swindle testified that Miller stated, "I confess. The knife is under my bed. They were cyberstalking my DVD player." Finally, Officer Tucker testified that when he later asked Miller what had happened between him and Greg, Miller responded, "We got into it[,] and I stabbed him." At no point in his interviews or statements to police did Miller ever claim that he stabbed Greg in self-defense or in the heat of passion.

¶23. After hearing all the evidence and testimony and receiving instructions on self-defense, second-degree murder, and heat-of-passion manslaughter, the jury found Miller

12

guilty of second-degree murder. Our caselaw is clear that the jury holds sole responsibility for assessing witness credibility and resolving any conflicts in the evidence, and this Court will not reweigh the evidence on appeal. *McCarty*, 247 So. 3d at 269 (¶25). Viewing the evidence in the light most favorable to the jury's verdict, we cannot say "the verdict is [so] contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice . . . ." *Blanden*, 276 So. 3d at 1208 (¶8). We therefore find this issue lacks merit.

### b.    Insanity

¶24.    Miller also argues on appeal that the overwhelming weight of the evidence established he was insane at the time he stabbed Greg. Relevant to this issue, the Mississippi Supreme Court has stated:

> The *M'Naghten*[2] test for determining insanity is whether the accused knew right from wrong at the time the act was committed. Specifically, the Court has held that [to] prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong.
>
> The determination of a defendant's sanity under the *M'Naghten* Rule is within the province of the jury, and the jury has discretion to accept or reject expert and lay testimony on the subject. A jury's finding on a defendant's sanity will not be reversed if it is supported by substantial evidence. We have held that, in insanity[-]defense cases, perhaps more than any other, a jury's verdict ought to be given great respect and deference.

*Ealey v. State*, 158 So. 3d 283, 293-94 (¶¶32-33) (Miss. 2015) (citations and internal quotation marks omitted).

---

[2] *M'Naghten's Case* (1843) 8 Eng. Rep. 718, 10 Clark & Finnelly 200.

¶25. Here, the jury heard testimony that, after he stabbed Greg, Miller returned home and concealed the knife under his bed. When the police officers arrived at his home shortly after the stabbing, Miller told them where he had hidden the knife. From this testimony, the jury could have reasonably inferred that Miller's actions indicated an awareness of the wrongfulness of his conduct. In addition, Dr. Lott never testified that Miller was legally insane under *M'Naghten*. Dr. Lott instead stated that he could not opine with any reasonable psychological certainty about Miller's legal sanity at the time of the stabbing. While Dr. Lott stated that he could not rule out the possibility that Miller had been legally insane, Dr. Lott also testified that he simply could not "offer an opinion with certainty regarding . . . [Miller's] appreciation or awareness of the wrongfulness of his actions regarding the murder." Because substantial evidence supported the jury's finding as to Miller's sanity, we cannot say that the verdict was against the overwhelming weight of the evidence or resulted in an unconscionable injustice. We therefore find this argument lacks merit.

## II.     Expert-Opinion Testimony

¶26. Miller also contends the circuit court erroneously allowed Leah to provide "unqualified expert[-]opinion testimony under the guise of lay[-]opinion testimony." Although the State never sought to offer Leah as an expert witness, the State asked for her opinion as to Miller's sanity. When Miller's attorney objected, the State responded that Leah was not providing expert-opinion testimony based on her professional medical experience but rather lay-opinion testimony based upon her personal observations of Miller.

¶27. We review the circuit court's admission or exclusion of evidence for abuse of

discretion. *Dennis v. State*, 271 So. 3d 722, 728 (¶25) (Miss. Ct. App. 2018). "[U]nless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014). We only reverse a case when "the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id.*

¶28. In the present case, we must determine whether Leah provided an opinion solely as a lay witness under Mississippi Rule of Evidence 701 or whether her testimony included an expert opinion governed by Mississippi Rule of Evidence 702. Rule 701 provides that a lay witness may offer opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." M.R.E. 701. "[I]f an opinion is based on scientific, technical, or other specialized knowledge, it can be admitted only under the guidance of Rule 702 as an expert opinion." *Chaupette*, 136 So. 3d at 1045-46 (¶8). Our caselaw establishes that "[a]n opinion is based on scientific, technical, or other specialized knowledge if the witness must possess some experience or expertise beyond that of the average randomly selected adult to express the opinion." *Id.* (internal quotation marks omitted).

¶29. Here, Leah's testimony about Miller's sanity satisfied the first two prongs of Rule 701 since her opinion held a basis in her personal perception of Miller and helped to determine a fact in issue. We further find, however, that Leah's opinion testimony was also based on the specialized knowledge she gained through her medical training—training that provided

15

"experience . . . [and] expertise beyond that of the average randomly selected adult . . . ." *Id.* Prior to asking whether Leah's experiences with Miller led her to doubt his sanity, the State delved into Leah's professional medical experience with people suffering from mental illness. Leah testified that she had performed civil commitments for several counties and that, in doing so, she psychiatrically evaluated people and provided the court with her medical opinions as to whether those people posed a danger to themselves or others. In opining about Miller's sanity, Leah responded that she "would not have recommended him for any kind of psychiatric issues . . . ."

¶30. Upon review, we find that Leah entered the realm of expert testimony when she relied upon her specialized medical knowledge, experience, and training to opine that Miller was not insane. Because Leah's testimony included an expert opinion governed by Rule 702 and she was never accepted as an expert witness, we hold the circuit court abused its discretion by admitting into evidence that portion of Leah's testimony. Nevertheless, we conclude that any error in the admission of Leah's expert-opinion testimony was harmless.

¶31. Our "[s]upreme [c]ourt 'has held that even errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming.'" *Dennis*, 271 So. 3d at 728 (¶26) (quoting *Clark v. State*, 891 So. 2d 136, 142 (¶29) (Miss. 2004)). Given the overwhelming weight of the evidence against Miller, we find the error in admitting Leah's expert-opinion testimony about Miller's sanity was harmless beyond a reasonable doubt.

### III. Photograph of Greg's Liver

16

¶32.    Miller next asserts that the circuit court erred by admitting into evidence the autopsy photograph of Greg's liver.  Miller contends that Greg's cause of death was undisputed and that the State had introduced into evidence other photographs showing the entry wound to Greg's chest.  Miller therefore argues that the picture of Greg's liver was not only gruesome but also possessed, at most, negligible probative value.

¶33.    We review a circuit court's admission of photographs for abuse of discretion. *McCarty v. State*, 262 So. 3d 553, 556-57 (¶9) (Miss. Ct. App. 2018).  "The [s]upreme [c]ourt has held that 'photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, describe the location of the body and cause of death, or supplement or clarify witness testimony.'" *Id.* at 557 (¶9) (quoting *Hutto v. State*, 227 So. 3d 963, 982 (¶55) (Miss. 2017)).  "Reversal based on the admission of cumulative and/or gruesome photographs is rare." *Id.*

¶34.    At trial, Miller's attorney objected that the photograph of Greg's liver served no other purpose than to inflame the jury.  Before admitting the photograph, the circuit court found it was relevant under Mississippi Rule of Evidence 401.  The circuit court determined the photograph helped the jury to "understand what happened" by showing "the nature and the extent of . . . [Greg's] injury . . . ."  The circuit court then conducted a balancing test under Mississippi Rule of Evidence 403 and determined the photograph was admissible because its probative value outweighed any danger of unfair prejudice.

¶35.    At trial, the jury heard testimony from Dr. Davis that Greg died from a stab wound to his abdomen that extended into his liver.  Dr. Davis also testified that the knife found under

17

Miller's bed was consistent with the type of weapon that could have inflicted Greg's fatal injury. Because the photograph of Greg's liver helped to describe his cause of death and to clarify Dr. Davis's testimony, we find no abuse of discretion in the circuit court's admission of the disputed photograph. *See McCarty*, 262 So. 3d at 557 (¶9). We therefore find this assignment of error lacks merit.

## CONCLUSION

¶36. Because we find no reversible error, we affirm Miller's conviction and sentence for second-degree murder.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**