# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01710-COA

**CHRISTOPHER MORRIS A/K/A**                     **APPELLANT**
**CHRISTOPHER JERMAINE MORRIS**

**v.**

**STATE OF MISSISSIPPI**                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/22/2016 |
| TRIAL JUDGE: | HON. JUSTIN MILLER COBB |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SHARON D. HENDERSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/14/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., McDONALD AND McCARTY, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1.     Following a jury trial, Christopher Jermaine Morris was convicted of first-degree murder, aggravated assault, and shooting into a dwelling.  On appeal, Morris argues that the State presented insufficient evidence to support his convictions; that the jury's verdict is contrary to the overwhelming weight of the evidence; that the trial judge erred by denying a circumstantial evidence jury instruction; that he was denied a fair trial for various other reasons; and that his constitutional right to a speedy trial was violated.  However, we find no error and affirm Morris's convictions and sentences.

### FACTS AND PROCEDURAL HISTORY

¶2.    On September 4, 2013, sometime between 10 and 11 p.m., Crystal King and Manuel Torres were sitting on King's front porch in Meridian. King testified that Morris pulled up in front of her house in a dark-colored truck or SUV and said that he needed to talk to Torres. Morris and Torres argued for five to ten minutes. Morris then left, but King saw him drive around the block a few times.

¶3.    King testified that Morris eventually returned and parked across the street. He got out of his vehicle and called for Torres to come to him. Torres walked over to Morris, and the two men began arguing again. Morris then yelled out for King to come to the street, but she told the two men that she was not getting involved. Morris told her that was the "wrong answer" and that she had "ten seconds." Morris then pulled out a gun and started shooting. He shot Torres, and Torres ran back toward King's house. King yelled at Torres not to come her way, so he turned and ran toward a funeral home directly across the street from King's house. Morris followed Torres. King heard Morris fire a few more shots, and Torres fell in some tall grass near the funeral home. Morris fired still more shots.

¶4.    Morris then walked back in the direction of King's house and began shooting at it. King lay on the front porch, hoping not to get shot. King's boyfriend, Wilson Gates, was sleeping in a front room of the house when the gunfire woke him. King yelled to Gates for help, so he crawled outside. Morris shot seven or eight times into the house. Morris finally stopped shooting, walked back to his vehicle, and drove away. After Morris left, King noticed that Gates's back was bleeding. He had a small graze wound on his back, but he did not realize that he had been shot. When paramedics arrived, they looked at the wound, but

Gates refused further treatment.

¶5. When law enforcement officers arrived, they followed a trail of blood from the street to where Torres lay in front of the funeral home. Torres was bleeding heavily from his leg and having difficulty breathing. Meridian Police Officer Eric Shirley asked Torres who shot him, and, according to Shirley, Torres said, "It's Bo. Bo's the one that shot me." Shirley tried to get more information from Torres, but Torres could only tell him "Bo" and that "Bo" drove a Caprice. Shirley was with Torres for five to ten minutes before the ambulance arrived. Shirley turned the information about "Bo" over to detectives and had no further involvement in the investigation.

¶6. Meridian Police Officer Kevin Boyd photographed and documented the blood trail, and Officer Rusty Powell recovered some shell casings found in the area after Boyd photographed them. They found shell casings in front of the funeral home, in the grass where Torres was found, and in the street in front of King's house. Most of the casings were within forty or fifty yards of where Torres was found. All casings recovered were from a 7.62-caliber Winchester gun, which Boyd testified was likely a rifle. No fingerprints were recovered from the casings. Boyd and Powell also photographed the exterior and interior of King's home, which had several bullet holes through the front wall and into the kitchen. Jars of food in the kitchen had been struck by the bullets and exploded on impact. A few projectiles were retrieved from the home as well.

¶7. Boyd and Powell asked King, Gates, and others associated with the case if they could identify "Bo." King and Gates would not speak with them the night of the shooting, but King

3

later gave a statement to police. She did not know who "Bo" was, but she identified Morris as the shooter. Powell also ran an alias search for the area and persons known as "Bo," but it turned up nothing.

¶8.     Torres was taken to a nearby hospital. Dr. Dru Denison testified that Torres had been shot in his right leg, nearly severing an artery in two, and had suffered significant blood loss. After Denison stopped the bleeding, he placed a shunt in Torres's leg to bypass the injured area. A blood clot later developed and blocked the shunt, which required additional surgery. Denison then created a bypass graft using a vein from Torres's left leg. That procedure was also unsuccessful, and Torres's leg had to be amputated. Denison testified that Torres was in the hospital for several days, possibly a week, before he died from his injuries. Testifying as an expert in general surgery, Denison opined that Torres died as a result of complications from his gunshot wound.

¶9.     Dr. J. Brent Davis, a forensic pathologist, also testified that the cause of death was complications from the gunshot wound. Davis did not conduct a toxicology screen on Torres because Torres had been in the hospital for over a week prior to his death, and he did not believe a toxicology screen was necessary to determine the cause of death. Davis examined Torres's body but was unable to examine Torres's amputated leg.

¶10.    A Lauderdale County grand jury indicted Morris for first-degree murder, aggravated assault, and shooting into a dwelling. Morris did not testify or call any witnesses at trial. The jury found him guilty on all three counts. Morris was sentenced to serve life without the possibility of parole for first-degree murder, ten years for aggravated assault, and ten years

for shooting into a dwelling. The court ordered the ten-year sentences to run concurrently with each other and consecutively to the life sentence. Morris filed a motion for a new trial, which was denied, and then appealed.

¶11. After the appeal was docketed and assigned to this Court, Morris filed a motion to remand the case to the circuit court to supplement the record and subpoena the trial recording. Morris alleged that the transcript omitted parts of King's testimony, comments by the trial judge identifying the alternate jurors, and an objection by defense counsel during the State's closing argument. A panel of this Court granted Morris's motion and ordered Morris's attorney and trial counsel for the State to "work together with the court reporter to ensure the transcript is an accurate representation of what occurred at trial." The panel also ordered the circuit clerk and the court reporter to supplement the record as necessary. The court reporter and circuit clerk supplemented the record with a transcript of the post-trial hearing on Morris's motion for a new trial, which had been omitted. However, the court reporter swore in an affidavit that the transcript of the trial itself was accurate.

¶12. Morris later filed a second motion in this Court in which he alleged that the court reporter had refused to comply with this Court's prior order. In response, a panel of this Court again remanded the case to the circuit court for the limited purpose of a hearing to resolve the dispute concerning the content of the record. *See* M.R.A.P. 10(e). At the hearing on remand, the court reporter testified that the trial transcript was accurate and that she did not recall any of the statements that Morris claimed were omitted. The disputed portions of the trial recording were played during the hearing. The circuit judge stated that he did not

5

hear any of the allegedly omitted statements, and he denied Morris's motion for supplemental transcripts or a copy of the trial recording.[1]

¶13.    Morris subsequently filed a third motion related to the trial transcript.  In his new motion, Morris alleged that certain parts of the trial recording "were not audible, muddled, inaccurate and included gaps and breaks."  He asked this Court to supplement the record on appeal to include the trial recording itself.  A panel of this Court denied Morris's motion, noting that Morris had not cited any specific inaccuracy in the transcript that had not already been addressed by the circuit court.

¶14.    Morris now raises five issues on appeal.  He argues that (1) there is insufficient evidence to support his convictions; (2) the jury's verdict is against the overwhelming weight of the evidence; (3) the trial judge erred by denying his request for a circumstantial evidence instruction; (4) a series of alleged errors deprived him of a fair trial; and (5) his constitutional right to a speedy trial was violated.  We find no error and affirm.

## ANALYSIS

### I.    Sufficiency of the Evidence

¶15.    Morris first argues that the trial judge erred by denying his motion for a directed verdict.  A motion for a directed verdict challenges the sufficiency of the evidence against the defendant, and we review the trial court's ruling de novo.  *Tillis v. State*, 43 So. 3d 1127, 1133 (¶17) (Miss. 2010).  The "test for sufficiency of the evidence is familiar":

> We view the evidence in the light most favorable to the prosecution to

---

[1] The trial judge passed away prior to the hearing on remand.  Therefore, a new judge presided over the hearing on remand and ruled on Morris's motions.

determine whether rational, reasonable fair-minded jurors *could have found* that the State proved each essential element of the crime. We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did. If, on any element of the crime, it is impossible to say that a reasonable person could have found that the State proved that element, then we must reverse and render. Otherwise, we must affirm [the denial of the motion for a directed verdict].

*Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010) (quotation marks, brackets, and footnote omitted).

¶16.    King testified that she saw Morris walk up to her house earlier in the evening to speak to Torres, that she saw him drive away and later return, that she saw him argue with and shoot Torres, and that she saw him walk back toward her house and shoot at her house. She positively identified Morris as the shooter, and she testified that although it was dark, a nearby street light allowed her to see Morris. She had known Morris for several years "from school."

¶17.    Morris argues that King's testimony is insufficient because it is the only evidence that connects him to the crime and because the victim identified another person ("Bo") as the shooter. However, officers testified that they were unable to find any person named "Bo" who could have been the shooter and that Morris was the only person they were able to identify as a suspect.

¶18.    Morris also argues that none of the physical evidence connects him with the shooting. Fingerprints could not be lifted from any of the bullet casings found at the scene, and the murder weapon was never found. However, "the absence of physical evidence does not negate a conviction where there is testimonial evidence." *Graham v. State*, 812 So. 2d 1150,

1153 (¶9) (Miss. Ct. App. 2002). King's testimony that Morris was the person shooting at Torres and at her home was sufficient to support convictions on all three charges. *Conner v. State*, 138 So. 3d 158, 163 (¶¶15-16) (Miss. Ct. App. 2013) ("[P]ositive identification by one witness of the defendant as the perpetrator of the crime may be sufficient . . . ." (quoting *Passons v. State*, 239 Miss. 629, 634, 124 So. 2d 847, 848 (1960))).

¶19. Morris also attacks his murder conviction by suggesting that Torres could have died as a result of an unknown drug overdose, medical malpractice, or some other cause. However, Denison testified that he was unaware of any contributing cause of Torres's death. In addition, Davis concurred that Torres died as a result of complications from the gunshot wound. This is sufficient evidence to support the murder conviction.

¶20. Morris also attacks his aggravated assault conviction, arguing that there is a lack of evidence that the wound on Gates's back was caused by a gunshot. He argues that witness testimony and one photograph of the wound are insufficient to support the conviction. However, King testified that she saw Gates's back bleeding and drew his attention to it. Gates testified that he did not get medical treatment because he did not want to miss work the next day and that he had not originally realized he had been hit. Gates and King both testified that Gates was in a bed in a front bedroom when the shooting started. Photographs showed a bullet hole directly above the bed where Gates was asleep. Gates and King testified that the bullet hole had not been there before the shooting. A photograph of the wound was also presented to the jury.

¶21. Though the wound to Gates's back was not serious, both Gates and King testified that

it was not there before the shooting started and that bullets had whizzed through the house near where Gates slept. Morris was convicted of aggravated assault for causing bodily injury to Gates by shooting him. *See* Miss. Code Ann. § 97-3-7(2)(a) (Supp. 2013). There was sufficient evidence for the jury to find that Gates was wounded by a bullet and that Morris fired the bullet.

¶22. The State also presented sufficient evidence for a guilty verdict on the shooting into a dwelling charge. *See* Miss. Code Ann. § 97-37-29 (Rev. 2006). King testified that she saw Morris shoot seven or eight times toward her home, and photographs showed the bullet holes and other damage to the home. Thus, viewing the evidence in the light most favorable to the State, there was sufficient evidence for a rational juror to find that the State had proven all three charges beyond a reasonable doubt.

## II.	Weight of the Evidence

¶23. Morris also argues that the trial judge erred by denying his motion for a new trial. We review the trial judge's ruling on a new trial motion for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). We "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶24. In arguing that he is entitled to a new trial, Morris asks us to reweigh the evidence and

9

make credibility determinations. Morris argues that King's identification of him was not credible. He points out that King declined to speak with police on the night of the shooting because she had been drinking. He also points out that the shooting occurred late on a dark street. Morris also argues that King's testimony that Morris drove an SUV does not match Torres's statement that the shooter ("Bo") had a Caprice. In addition, King originally told police that the shooter had a "handgun," but law enforcement testified that the bullet casings were likely from a rifle. At trial, King explained that she did not get a good look at the gun. She testified that she still did not know exactly what kind of gun Morris was shooting, and by "handgun" she simply meant "a gun that was in his hands."

¶25.   However, even if King was impeached in some respects, "the jury remained the ultimate decision-maker as to what weight and worth to give [her] testimony." *Jordan v. State*, 763 So. 2d 935, 937 (¶4) (Miss. Ct. App. 2000). It is the jury's role to decide which witnesses are credible. *Little*, 233 So. 3d at 289, 292 (¶¶1, 20). As an appellate court, we do not second-guess such determinations. *Id.* Furthermore, "[t]he testimony of a single uncorroborated witness is sufficient to sustain a conviction[.]" *Williams v. State*, 512 So. 2d 666, 670 (Miss. 1987). "Unless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decision in such matters is beyond the authority of a reviewing court to disturb." *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000).

¶26.   Morris's trial counsel thoroughly cross-examined the witnesses and pointed out possible conflicts in the evidence. But the issues that Morris raises "were ordinary issues of

impeachment and credibility for a jury to resolve." *McCarty v. State*, 247 So. 3d 260, 270 (¶33) (Miss. Ct. App. 2017), *cert. denied*, 246 So. 3d 885 (Miss. 2018). And the jury apparently believed the State's witnesses. The verdict is not against the overwhelming weight of the evidence, and the trial judge did not abuse his discretion by denying Morris's motion for a new trial.

### III. Circumstantial Evidence Instruction

¶27. Morris next argues that the trial judge abused his discretion by denying his proposed circumstantial evidence jury instruction. We review the denial of a jury instruction for an abuse of discretion only. *Moore v. State*, 247 So. 3d 1198, 1201 (¶14) (Miss. 2018).

¶28. Our Supreme Court has held that a defendant is entitled to some version of a circumstantial evidence instruction if the case against him "is entirely circumstantial—that is, if there is no direct evidence of the gravamen of the offense charged." *Beasley v. State*, 283 So. 3d 745, 750 (¶16) (Miss. Ct. App. 2019). "Direct evidence . . . must directly and not by inference implicate the accused and not just show that there has been a crime." *Burleson v. State*, 166 So. 3d 499, 509 (¶29) (Miss. 2015) (quotation marks omitted). Direct evidence includes a confession, the testimony of an eyewitness to the gravamen of the offense, or surveillance video of the gravamen of the offense. *Moore*, 247 So. 3d at 1201-02 (¶¶16, 19). In contrast, the Supreme Court "has defined circumstantial evidence as evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Burleson*, 166 So. 3d at 509 (¶29) (quotation marks omitted). "To remove [a] case from the circumstantial evidence realm, the State [bears] the burden of

11

adducing evidence to show directly, and not merely by inference, that [the defendant committed the crime charged]." *Moore*, 247 So. 3d at 1202 (¶17).

¶29.    A circumstantial evidence instruction was not required in this case because King was an eyewitness and identified Morris as the shooter.  Morris argues that King's testimony was only circumstantial evidence because she acknowledged that it was dark and that she could not make out the details of Morris's face as he was shooting Torres.  However, King testified that she knew Morris and could see him clearly—including as he walked back toward her and fired on her house.  King's eyewitness testimony was direct evidence.  Therefore, the trial judge did not abuse his discretion by denying Morris's proposed instruction.

### IV.    Fair Trial

¶30.    Morris argues that he did not receive a fair trial because of the "cumulative effect" of several alleged errors.  He specifically alleges that the State committed "discovery violations," that unspecified matters were omitted from the trial transcript, that the State engaged in improper closing argument, and that the trial judge erred by refusing a jury instruction regarding the testimony of law enforcement officers.  We address each of these issues, although Morris's arguments are cursory and cite no relevant authority.

### A.    Alleged Discovery Violations

¶31.    Morris asserts that he was prejudiced because the State failed to timely provide a complete witness list, Torres's medical records, and the autopsy report.  He alleges that the trial judge allowed only ten minutes for him to review untimely disclosed evidence, which was not sufficient.  He also objects that the State failed to provide Dr. Denison's resume and

12

that the trial judge failed to order a recess for the State to produce the resume.

### 1. Witness List

¶32.    There is nothing in the record to support Morris's claim that the State failed to provide a witness list. In a pretrial hearing, Morris's counsel stated that the State had mentioned potential witnesses who were not then included on the State's witness list. The prosecutor responded that the State had encountered difficulty serving some subpoenas but would update the witness list as necessary. During trial, Morris did not allege that the State had failed to disclose any witness or object to any witness's testimony on that ground. Therefore, this issue is without merit. *See, e.g.*, *Hampton v. State*, 148 So. 3d 992, 995 (¶7) (Miss. 2014) ("This Court declines to consider matters which were never presented or argued in the trial court and are not part of the record before us today.").

### 2. Medical Records and Autopsy Photos

¶33.    Morris also argues that he was prejudiced because Torres's medical records and certain autopsy photographs were not produced prior to trial. Morris's attorney was given time to review this evidence—a brief recess for the photographs and an overnight recess for the records—but Morris claims that the time allotted was insufficient.

¶34.    On appeal, Morris claims that the late disclosure of medical records limited his ability to cross-examine Dr. Denison or consult with an independent expert regarding other possible causes of death. However, Morris did not raise these issues or make these arguments in the trial court. Accordingly, this issue is waived. *E.g.*, *Triplett v. State*, 264 So. 3d 808, 815 (¶25) (Miss. Ct. App. 2018) ("It is well established that an objection on one or more specific

13

grounds constitutes a waiver of all other grounds." (quotation marks omitted)), *cert. denied*, 265 So. 3d 180 (Miss. 2019). In addition, the medical records were neither admitted into evidence nor marked for identification, so Morris cannot establish on appeal that their late disclosure prejudiced him in any way.

### 3. Dr. Denison's Resume

¶35. When the State tendered Dr. Denison as an expert witness in general surgery, defense counsel objected on the grounds that the State had not sufficiently established Denison's qualifications or provided his resume. The trial judge sustained the objection, and the State further voir dired Denison about his qualifications. The State again tendered Denison as an expert, and defense counsel again objected because she had not seen a resume. The trial judge offered defense counsel an opportunity to voir dire Denison on his qualifications, but counsel responded, "Your Honor, I can't do it, because I don't have a resume from which to question him; so I cannot do it." The trial judge overruled her objection, and Denison was accepted as an expert in general surgery.

¶36. On appeal, Morris reiterates his objection that Denison should not have been allowed to testify without first providing a resume, but he provides no authority in support of this contention. Morris had the opportunity to examine Denison regarding his qualifications and credentials, but his attorney refused to do so. This issue is without merit.

### B. Alleged Prosecutorial Misconduct

¶37. Morris argues that the State deliberately misled jurors when the prosecutor suggested during closing arguments that Torres's dying words may have been "Bro shot me" rather than

"Bo shot me." The prosecutor acknowledged that Officer Eric Shirley testified that Torres said "Bo" had shot him. But the prosecutor also pointed out that King testified that when Torres and Morris argued, Torres said to Morris, "Bro, I'm telling you, it wasn't me." The prosecutor then argued, "Ladies and gentlemen, don't let an 'R' screw this case up for you. The difference between Bo and Bro, when this officer is out there listening to a dying man or what he thought was a dying man is insignificant."

¶38. According to the transcript, Morris did not object to these remarks. Morris continues to insist that his attorney did object but that the court reporter failed to transcribe the objection. However, at a hearing held pursuant to Mississippi Rule of Appellate Procedure 10(e), the circuit judge listened to the audio recording of the closing argument and found that there was no objection. In addition, the circuit judge also found that there were no "breaks" in the recording of the closing argument that might account for an inaudible objection, and defense counsel conceded that no objection could be heard on the recording.

¶39. This issue is without merit. "Contemporaneous objections to allegedly erroneous comments of the prosecuting attorney in closing arguments must be made or the point is waived." *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986). In the absence of a contemporaneous objection, "the point may be considered" on appeal only "if the argument [was] so 'inflammatory' that the trial judge should have objected on his own motion." *Id.* (quoting *Griffin v. State*, 292 So. 2d 159, 163 (Miss. 1974)). Here, the prosecutor's comments were not so inflammatory as to require sua sponte action by the trial judge. Indeed, even if Morris had objected, the prosecutor's comments were a fair argument based

on the evidence, which the jury was free to accept or reject. *See Williams v. State*, 684 So.

2d 1179, 1205 (Miss. 1996) ("Wide latitude is generally available to counsel to argue his case

on closing argument.").

### C.     The Transcript

¶40.    Morris asserts that the denial of his request for the court reporter's audio recordings

prevented him from reviewing a transcript to support his claims on appeal.  In motions filed

in this Court, Morris specifically alleged that the transcript omitted (1) a part of King's

testimony, (2) the trial judge's identification of alternate jurors in open court prior to the start

of the trial, and (3) an alleged objection to the State's closing argument, which we have

already discussed above.

¶41.    We previously remanded the case to the circuit court for a hearing pursuant to

Mississippi Rule of Appellate Procedure 10(e) to determine whether the transcript needed

to be corrected.  At that hearing, Morris asserted that King testified at trial, "I know my

bodies," as part of her in-court identification of Morris.  Morris argues that the comment

undermines King's credibility and identification.  However, that statement is not in the

transcript, and the court reporter testified that the transcript was accurate.  In addition, the

relevant part of the audio recording of the trial was played at the hearing on remand, and the

circuit judge found that King made no such statement.  In short, there is no credible evidence

to support Morris's claim that King made such a statement.  Moreover, even if King had

made such a statement, it would not affect the outcome of this appeal.

¶42.    As to the alleged identification of alternate jurors, the circuit judge also listened to the

relevant portions of the audio recording and found that the trial judge did *not* identify the alternate jurors until just before the jury retired to deliberate.[2] In addition, the circuit clerk and two court reporters stated in affidavits that the trial judge never identified alternate jurors until just before the jury retired to deliberate. The court reporter in this trial also testified at the hearing on remand that the trial judge followed his usual practice in this case. In short, there is no credible evidence to support Morris's claim or to contradict the circuit judge's finding on remand. Finally, Morris fails to explain how the alleged pretrial identification of the alternate jurors would have prejudiced him in this case given that the alternates were not needed and did not participate in deliberations.

¶43. In short, these arguments are without merit. Morris presented no credible evidence of any omission in the transcript. Nor has he shown that the matters allegedly omitted would have had any impact on the outcome of this appeal.

### D. Proposed Jury Instruction on Testimony of Law Enforcement Officers

¶44. Morris argues that the trial judge erred by refusing his proposed jury instruction D-8, which read:

> The Court hereby instructs the jury that the testimony of a law enforcement officer should be considered by you just as any other evidence in this case. In evaluating his or her credibility, you should use the same guidelines which you apply to the testimony of any witness. In no event should you give greater or lesser credence to the testimony of any witness nearly [sic] because he or she is a law enforcement officer.

---

[2] As noted, the original trial judge passed away after trial and while Morris's motions were pending before this Court. A different circuit court judge presided over the post-trial motions regarding sufficiency of the transcript.

The trial judge refused the requested instruction because it improperly singled out law enforcement officers and because instruction C-1 already instructed the jurors that they were the sole judges of the credibility of the witnesses and that they should use their own common sense and good judgment in considering and weighing the testimony.

¶45.    As noted above, we review the refusal of a jury instruction for an abuse of discretion. A proposed jury instruction may be refused if its substance is fairly covered by other instructions. *Howell v. State*, 860 So. 2d 704, 745 (¶¶ 142, 144) (Miss. 2003). In addition, jury instructions should not "comment on the weight of the evidence." *Id.* at (¶143). For these reasons, our Supreme Court has "soundly and repeatedly rejected" the argument that the trial judge should give a specific instruction, like Morris's proposed D-8, on the testimony of law enforcement officers. *Id.* at 746-47 (¶¶150-52) (citing *Austin v. State*, 784 So. 2d 186, 192-93 (¶¶19-22) (Miss. 2001)). A general instruction such as C-1 is sufficient. *Id.* Accordingly, this issue is without merit.[3]

### V.    Speedy Trial

¶46.    Morris asserts on appeal that his right to a speedy trial was violated. Morris lists the four "*Barker* factors," *see generally Barker v. Wingo*, 407 U.S. 514 (1972), but his one-paragraph argument makes no effort to apply those factors to the facts or record in this case. Indeed, Morris does not even articulate the length of the relevant delay in this case. This

---

[3] Morris also argues that he is entitled to a new trial because of the "cumulative effect" of the alleged errors discussed above in section IV(A–D). However, reversal based on cumulative error requires a finding of multiple errors that are individually harmless. *Rogers v. State*, 205 So. 3d 660, 664-65 (¶17) (Miss. Ct. App. 2015). Because Morris fails to identify any error, the cumulative error doctrine is inapplicable.

claim is waived due to Morris's failure to make any meaningful argument in support of it. *Patton v. State*, 109 So. 3d 66, 75 (¶22) (Miss. 2012); M.R.A.P. 28(a)(7).

## CONCLUSION

¶47.    There is sufficient evidence to support Morris's convictions, and the jury's verdict is not against the overwhelming weight of the evidence.  In addition, Morris received a fair trial, and he has not identified any reversible error.

¶48.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**